## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JEREMY RAYMO, FORREST POULSON, GARY GASTER, BRENDON GOLDSTEIN, and MANUEL PENA, on behalf of themselves and all others similarly situated, | Case No.<br><br>JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| FCA US LLC, a Delaware corporation, and CUMMINS INC., an Indiana corporation, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................1

    A.  Jurisdiction and Venue ...................................................15

II.  PARTIES ...................................................................16

    A.  Plaintiffs .............................................................16

        1.  Jeremy Raymo ...................................................17

        2.  Forrest Poulson ..................................................20

        3.  Gary Gaster ....................................................22

        4.  Brendon Goldstein ...............................................25

        5.  Manuel Pena ....................................................27

    B.  Defendants ...........................................................30

III.  FACTUAL ALLEGATIONS .....................................................32

    A.  The Environmental Challenges Posed by Diesel Engines and
        the U.S. Regulatory Response .............................................32

        1.  The Environmental Damage ......................................36

        2.  The Worldwide Emissions Scandal ................................39

        3.  The Emissions Trading System ...................................43

        4.  Cummins' Entry into the Clean-Diesel Market ......................45

        5.  Dodge and Cummins Jointly Develop and Promote the
            Vehicles ......................................................48

        6.  The Defendants' Emissions Deceptions ...........................61

        7.  The FCA-Cummins Litigation ....................................64

        8.  Use of the Mail and Wire Communications .........................72

9.     Plaintiffs' and Class Members' Economic Damage .................75

IV.    TOLLING OF THE STATUTE OF LIMITATIONS ...................76

       A.    Discovery Rule Tolling ..................................................................76

       B.    Fraudulent Concealment Tolling ..........................................78

       C.    Estoppel ...........................................................................................78

V.     CLASS ALLEGATIONS ................................................................79

       A.    Claims Brought on Behalf of the Nationwide Class ..........................84

COUNT I  VIOLATION OF 18 U.S.C. § 1962(C)–(D): THE RACKETEER
       INFLUENCED AND CORRUPT ORGANIZATIONS ACT
       ("RICO").......................................................................................84

            1.     The Emission Fraud Enterprise ..................................85

            2.     Mail and Wire Fraud ...................................................90

COUNT II  VIOLATIONS OF 15 U.S.C. § 2301 *ET SEQ.* THE
       MAGNUSON-MOSS WARRANTY ACT...............................100

       B.    Claims Brought on Behalf of the Michigan Subclass ......................103

COUNT I  VIOLATION OF THE MICHIGAN CONSUMER
       PROTECTION ACT  (MICH. COMP. LAWS § 445.903 *ET SEQ.*) .........103

COUNT II  FRAUDULENT CONCEALMENT (BASED ON MICHIGAN
       LAW)...............................................................................................108

COUNT III  BREACH OF CONTRACT (BASED ON MICHIGAN LAW) ......116

       C.    Claims Brought on Behalf of the Alabama Subclass ......................117

COUNT I  VIOLATIONS OF THE ALABAMA DECEPTIVE  TRADE
       PRACTICES ACT (ALA. CODE § 8-19-1 *ET SEQ.*) ...............................117

COUNT II  BREACH OF CONTRACT  (BASED ON ALABAMA LAW).......119

COUNT III  FRAUDULENT CONCEALMENT (BASED ON ALABAMA
       LAW)...............................................................................................120

D.      Claims Brought on Behalf of the Florida Subclass ............................ 128

COUNT I  VIOLATIONS OF THE FLORIDA UNFAIR AND
            DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201
            *ET SEQ.*) ................................................................................. 128

COUNT II  BREACH OF CONTRACT (BASED ON FLORIDA LAW) ........... 133

COUNT III  FRAUDULENT CONCEALMENT (BASED ON FLORIDA
            LAW) ...................................................................................... 134

E.      Claims Brought on Behalf of the Georgia Subclass ......................... 142

COUNT I  VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES
            ACT (GA. CODE ANN. § 10-1-390 *ET SEQ.*) ......................... 142

COUNT II  BREACH OF CONTRACT (BASED ON GEORGIA LAW) .......... 143

COUNT III  FRAUDULENT CONCEALMENT (BASED ON GEORGIA
            LAW) ...................................................................................... 144

F.      Claims Brought on Behalf of the Pennsylvania Subclass ................. 152

COUNT I  BREACH OF CONTRACT  (BASED ON PENNSYLVANIA
            LAW) ...................................................................................... 152

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
            PENNSYLVANIA LAW) ........................................................... 153

VI.     REQUEST FOR RELIEF ........................................................................ 161

VII.    DEMAND FOR JURY TRIAL ................................................................. 162

Plaintiffs Jeremy Raymo, Forrest Poulson, Gary Gaster, Brendon Goldstein, and Manuel Pena, individually and on behalf of all others similarly situated (the "Class"), allege the following based upon the investigation of counsel, the review of scientific papers, and the investigation of experts.

## I.      INTRODUCTION

1.      A cardinal rule of business is that you fix a product if it is defective. Indeed, most companies consider it their moral and legal obligation to do so. But when FCA[1] and Cummins discovered at least as early as 2014 that the selective catalytic converter (SCR) system in certain Dodge Ram trucks was defective—and that these trucks were emitting harmful pollutants and experiencing a precipitous drop in performance—they did not rush to fix the problem. Instead, they sued each other and used the defect as leverage in their negotiations over who was going to pay to fix it.

2.      Defendants' intent to evade their responsibilities at the cost of the consumer is not conjectural or speculative. It is all laid out in remarkable filings each side submitted as part of their litigation battle in *FCA US LLC v. Cummins Inc.*, No. 2:16-cv-12883-AC-SDD (E.D. Mich.) ("FCA Litigation"). In those filings, we learn that, according to Cummins, a recall to fix the defect was "in the public interest to ensure that Vehicles which are not emissions[-]compliant are

---

[1] "FCA" is Fiat Chrysler Automobiles.

appropriately recalled and remedied to avoid future harm to the environment."[2]
The potential recall affected over 135,000 trucks and truck owners, and—again
according to Cummins—the environmental impact "could be significant."[3] Despite
this imminent harm, Cummins contends that "FCA refuses [to effect a recall] for
one reason – money. FCA is holding both Cummins and its own customers hostage
to FCA's commercial demands."[4] And FCA knew about the problem for *years*. As
Cummins stated, it "discovered that FCA had been receiving an increasing number
of warranty claims relating to the SCR and emissions issues in the Vehicles for
***several years prior*** to Cummins discovering the emissions issues in the Vehicles."[5]

3.      The pressing need for the recall came to light in the following
exchange in the FCA Litigation between the Court and Cummins' counsel during a
hearing for a temporary restraining order:[6]

> The Court: And so Chrysler, because it doesn't want to
> incur the expense, is allowing cars that it sold to go out
> on the road and emit pollutants that are a potential
> danger?
>
> [Cummins' attorney]: Yes.

---

[2] FCA Litigation, Cummins' Motion for TRO and Preliminary Injunction (ECF No. 5) at 4.

[3] FCA Litigation, Cummins' Brief in Support of Its Motion for TRO and Preliminary Injunction (ECF No. 5) at 24.

[4] *Id.* at 1.

[5] FCA Litigation, Cummins' Verified Answer, Affirmative Defenses, Counterclaim and Jury Demand (ECF No. 9) at 13 (emphasis added).

[6] FCA Litigation, TRO Hearing Transcript (ECF No. 18) at 15.

- 2 -

4.     As Cummins argued, "leaving thousands of consumers with inoperable vehicles—and no communications to those consumers that their vehicle is inoperable due to a matter that is the subject of an approved recall— unequivocally harms the public."[7]

5.     Cummins' claims—backed by sworn declarations—are entitled to substantial weight because FCA and Cummins have worked together for decades. They have described their relationship as "the most formidable partnership in the working world."[8] FCA and Cummins are intimately familiar with each other's business, and they know each other's strengths and weaknesses, their challenges in selling trucks that meet EPA requirements, and the technological problems that they have had to overcome.

6.     Based on class counsel's investigation, in consultation with automobile emissions experts, the specific dispute in the FCA Litigation is in fact only part of a larger defect (referred to herein as the "Defect"). Model year 2013– 2017 Dodge Ram trucks (2500s and 3500s) with a Cummins 6.7-liter diesel engine (the "Vehicles") have an SCR system that breaks down, emits emissions in excess of federal and California standards, and has a diesel particulate filter (DPF) that

---

[7] *FCA US LLC v. Cummins Inc.*, No. 16-2335 (6th Cir.), Cummins' Response in Opposition to FCA's Motion to Vacate or Stay TRO Order (ECF No. 12) at 24.

[8] Exhibit 1, Ram brochure (2012) at 4, available at http://www.auto-brochures.com/makes/ram/Ram_US%20HD_2012.pdf (last accessed June 29, 2017).

becomes clogged with soot. When the DPF is clogged, the truck is programmed to go into regeneration mode, thereby burning more fuel to clear the filter. Truck owners who have their truck serviced at the dealerships have their Power Control Modules (PCMs) "flashed," or reprogrammed, to burn even more fuel in an attempt to burn off the soot. Truck owners are often not told that they are having their system flashed, either before or after the dealership works on their truck. The effect of the "flashing" is that the system runs hotter than before, thereby damaging the DPF and all exhaust and engine components. After the flashing, truck owners experience a precipitous decline in the Vehicles' fuel economy, as measured in miles per gallon (MPG). On average, the drop experienced by Plaintiffs in MPG was 20–25%, costing them several hundred dollars a year in out-of-pocket expenses. Upon information and belief, truck owners were deliberately left in the dark about what the dealership was doing with their Vehicles because of this drop in performance.

7.     Plaintiff Forrest Poulson has had his truck "flashed" three times. On one occasion, he asked his dealership's mechanic why they were doing it. The mechanic replied, "I will deny this later, but I can tell you that the PCM updates are diverting fuel into the exhaust system to make it burn hotter so that it reduces the amount of emissions leaving the tailpipe." The mechanic also told him that

- 4 -

upwards of 25% of the fuel is being diverted through the exhaust system to heat up the emissions.

8.     The Defect is part of a long-running saga involving efforts by auto and engine companies to meet (and evade) the EPA's emissions requirements. Many companies—including FCA and Cummins—have been accused of purporting to meet these requirements by cheating and by designing emissions that simply do not work. Diesel engines pose a difficult challenge to the environment because they have an inherent trade-off between power, fuel efficiency, and emissions. Compared to gasoline engines, diesel engines generally produce greater torque, low-end power, better drivability, and much higher fuel efficiency. But these benefits come at the cost of much dirtier and more harmful emissions.

9.     One by-product of diesel combustion is oxides of nitrogen (NOx), which generally describes several compounds comprised of nitrogen and oxygen atoms. These compounds are formed in the cylinder of the engine during the high temperature combustion process. NOx pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone.

10.     According to the U.S. Department of Justice:[9]

---

[9] *See* Exhibit 2, DOJ Press Release, *United States Files Complaint Against Fiat Chrysler Automobiles for Alleged Clean Air Act Violations* (May 23, 2017),

> NOx pollution contributes to the formation of harmful smog and soot, exposure to which is linked to a number of respiratory- and cardiovascular-related health effects as well as premature death. Children, older adults, people who are active outdoors (including outdoor workers), and people with heart or lung disease are particularly at risk for health effects related to smog or soot exposure. Nitrogen dioxide formed by NOx emissions can aggravate respiratory diseases, particularly asthma, and may also contribute to asthma development in children.

11.    The United States government, through the Environmental Protection Agency (EPA), as well as many states, like California, have passed and enforced laws designed to protect United States citizens from these pollutants and certain chemicals and agents known to cause disease in humans. Automobile manufacturers must abide by these laws and must adhere to the EPA's rules and regulations.

12.    Seeing a major opportunity for growth, almost all of the major automobile manufacturers rushed to develop "clean diesel" and promoted new diesel vehicles as environmentally friendly and clean. Volkswagen, Mercedes, GM, FCA, and others began selling diesel cars and trucks as more powerful, yet also as an environmentally friendly alternative to gasoline vehicles. Cummins also moved aggressively to capture the diesel engine market by developing engines that purported to meet EPA requirements.

---

https://www.justice.gov/opa/pr/united-states-files-complaint-against-fiat-chrysler-automobiles-alleged-clean-air-act.

- 6 -

13.    The rush for clean diesel changed dramatically on September 18, 2015, when the EPA issued a Notice of Violation of the Clean Air Act to Volkswagen Group of America, Volkswagen AG, and Audi AG for installing illegal "defeat devices" in 2009–2015 Volkswagen and Audi diesel cars equipped with 2.0-liter diesel engines. On September 22, 2015, Volkswagen announced that 11 million diesel cars worldwide were installed with the same Defeat Device software that had evaded emissions testing by U.S. regulators. A defeat device is a program that allows the vehicle to pass an emissions test, but when it senses the vehicle is not being tested, the program reduces NOx reduction controls.

14.    The "Dieselgate" issue is not limited to passenger vehicles. In fact, the EPA recently announced that FCA's Dodge Ram 1500 "EcoDiesel" trucks (model years 2014–2016) contain defeat devices. On January 12, 2017, the EPA issued a notice of violation against FCA because FCA failed to disclose auxiliary emission control devices in the EcoDiesel trucks.[10] The EPA identified eight specific devices that cause the vehicles to perform effectively when being tested for compliance, and then reduce the effectiveness of the emissions control system during normal operation and use. On May 23, 2017, after efforts at a negotiated settlement failed,

_____

[10] Exhibit 3, EPA's Notice of Violation to FCA US LLC et al. (Jan. 12, 2017), available at https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017-01-12.pdf.

- 7 -

the U.S. Department of Justice sued FCA in this District to compel them to fix the problem.[11]

15.    "Once again," said CARB Chair Mary D. Nichols about FCA's cheating, "a major automaker made the business decision to skirt the rules and got caught."[12]

16.    Separately, a putative class of truck owners have sued FCA and Cummins in this District for falsely marketing and selling model year 2007–2012 trucks (2500s and 3500s) with 6.7-liter Cummins diesel engines as the "strongest, cleanest, quietest diesel engine in its class," when in fact those trucks emitted pollutants far in excess of applicable federal and state requirements, and beyond the expectations of a reasonable consumer.[13] The SCR system at issue in this case is a new technology in the diesel engines that was not used in the 2007–2012 trucks.

17.    In order to produce a diesel engine that has desirable torque and power characteristics, good fuel economy, and emissions levels low enough to meet stringent European and United States emission standards, FCA and Cummins

---

[11] *See United States of America v. FCA US LLC et al.*, No. 5:17-cv-11633-JCO-EAS (E.D. Mich.).

[12] Exhibit 4, EPA News Release, *EPA Notifies Fiat Chrysler of Clean Air Act Violations* (Jan.12, 2017), available at https://www.epa.gov/newsreleases/epa-notifies-fiat-chrysler-clean-air-act-violations.

[13] *See Bledsoe et al. v. FCA US LLC et al.*, No. 4:16-cv-14024-TGB-RSW (E.D. Mich.).

developed the 6.7-liter diesel engine with an SCR (the "Engine"). The primary

emission control after-treatment technologies include a DPF and the SCR. The

DPF traps and removes particulate (soot) emissions, while the SCR facilitates the

capture and reduction of NOx into less harmful substances, such as nitrogen and

oxygen.

18.    But the SCR system, as Defendants acknowledged for certain trucks

in the FCA Litigation, does not work as intended and emits pollutants that exceed

EPA and California limits. According to Cummins' own testing, the emissions

exceed applicable limits by *50%*.[14] When the emissions system shuts down or stops

functioning, the Vehicles receive a warning that they are about to go into "limp

mode," which requires them to reach a dealership within a specified mileage range,

regardless of where they are in the country. Here is an example of a warning the

Vehicles display before going into limp mode:

---

[14] FCA Litigation, Exhibit 2 to FCA's Response in Opposition to Cummins'
Motion for TRO and Preliminary Injunction (ECF No. 16-3).



19.     The risk that the Vehicles will suddenly limp along on the highway

can have significant, real-world consequences for Vehicle owners. For example,

Plaintiff Gary Gaster was pulling his camper to take his family camping and was

driving from Pennsylvania to Kentucky. More than 175 miles outside of his

hometown, on a weekend, he received the "limp mode" warning. He pulled into an

FCA dealership, but they did not have the parts to fix the truck. Rather than risk the truck going into limp mode as he searched for another dealership, or as he attempted to drive home (all with his family in tow), he was forced to trade in his truck on the spot in Bedford, Pennsylvania, for a Ford. This trade-in cost him approximately $5,000 in accessories that he installed on his truck that were lost, plus at least $2,100 in taxes and additional fees in purchasing the Ford.

20. Even with knowledge that the Vehicles failed to meet EPA requirements, both FCA and Cummins continued to advertise and represent that the trucks were EPA-compliant. For the 2013 trucks—the very same trucks that they have admitted violate EPA standards—FCA *to this day* continues to market them as follows: "For 2013, Cummins improves the classic Turbo Diesel in Ram Heavy Duty models with a Next-Generation Diesel Exhaust Fluid (DEF)/Select Catalytic Reduction (SCR) system that's *fully compliant with recent federal mandates*."[15] In its 2013 owner's manual, FCA continues to state that "[t]he Cummins® diesel engine meets all EPA Heavy Duty Diesel Engine Emissions Standards, *resulting in the lowest emitting diesel engine ever produced*."[16]

---

[15] Exhibit 5, Ram brochure (2013) at 6, available at https://www.ramtrucks.com/en/pdf/141550_DRP12US_HD_eBrochure.pdf (emphasis added).

[16] Exhibit 6, Ram Owner's Manual (Ram Truck Diesel Supplement) (2013) at 120, available at https://www.ramtrucks.com/download/pdf/manuals/2013-RAM-Diesel-SU-3rd.pdf?myyear_supplemen (emphasis added).

Subsequent manuals for the 2014–2017 trucks continue to say—even today—that

"[t]he Cummins® diesel engine meets all EPA Heavy Duty Diesel Engine

Emissions Standards, resulting in one of the lowest emitting diesel engines ever

produced."[17]

21.     Cummins also has consistently advertised the trucks and their engines

as fully EPA-compliant. To this day, Cummins still advertises the Engines in the

Vehicles as follows:[18]

> Working closely to integrate with Ram, a more
> aggressive calibration for the Cummins 6.7L Turbo
> Diesel produces an additional 15 lb.-ft. of torque. This
> improvement places the coveted engine ahead of the
> competition with 865 lb.-ft. of torque, while maintaining
> performance *and EPA compliance*.

22.     Finally, FCA and Cummins continue to falsely advertise that the

Vehicles are tough and dependable, and that they deliver value for the customer,

---

[17] Exhibit 7, Ram Owner's Manual (Ram Truck Diesel Supplement) (2014) at
172, 184, 301, available at https://www.ramtrucks.com/download/pdf/manuals/
2014-RAM_15_25_35_45_55_Diesel-SU-6th.pdf?myyear_supplement=20&
myvehicle_supplement=1&o-download-button,%20at%20172; Exhibit 8, Ram
Owner's Manual (Ram Truck Diesel Supplement) (2015) at 61, 187, 199, 302,
available at https://www.ramtrucks.com/download/pdf/manuals/2015-RAM_
15_25_35_45_55-Diesel-SU-4th.pdf?myyear_supplement=21&myvehicle_
supplement=1&o-download-button.x=39&o-download-button.y=8; Exhibit 9, Ram
Owner's Manual (Ram Truck Diesel Supplement) (2016) at 83, 352, available at
https://carmanuals2.com/d/72779; Exhibit 10, Ram Owner's Manual (Ram Truck
Diesel Supplement) (2017) at 197, available at https://www.mopar.com/moparsvc/
tweddle/publications?id=2035.

[18] Exhibit 11, *2015 Cummins Powered Ram Trucks Deliver Best-in-Class 865-
lb-ft of Torque*, Cummins, http://social.cummins.com/model-year-2015-cummins-
powered-ram-trucks-deliver-best-in-class-865lb-ft-torque/ (emphasis added).

- 12 -

including through high MPG. As FCA proclaimed, "[w]ith B20 biofuel capability and reduced greenhouse gas emissions, our engineers were proud to build a lineup around an engine that's as responsible as it is powerful."[19] Cummins advertised its engines—including the engines in the Vehicles—as follows:[20]

> Cummins is ahead of the curve in developing engines that deliver everything from better fuel economy to improved reliability and durability. We're even meeting greenhouse gas (GHG) emissions standards a year ahead of schedule.
>
> There's no compromise on performance, as these engines deliver the same ratings lineup and torque as previous models. . . .
>
> Cummins 2013 engines are a step ahead in delivering lower operating costs and improved productivity – making it easier for you to stay a step ahead of your competition.

23.     The public pronouncements of their enduring partnership were not simple puffery; they worked closely together behind the scenes as well. Indeed, they had a special incentive to do so. Under the EPA regulations, Cummins was able to "bank" emissions credits to spend on other, dirtier engines.[21] Cummins, in turn, could share those credits with FCA. As a result, the Defendants were able to

---

[19] Exhibit 12, *B20 Biofuel*, Ram Trucks, available at http://web.archive.org/web/20150810004746/ramtrucks.com/en/groundbreakers/#engine (captured Aug. 10, 2015).

[20] Exhibit 13, *Cummins On-Highway Engines*, Cummins, available at https://web.archive.org/web/20160308135548/http://cumminsengines.com:80/on-highway (captured Mar. 8, 2016).

[21] *See* 40 C.F.R. § 1036.701 *et seq.*

- 13 -

design and build dirty trucks—effectively shifting the cost of those dirty trucks to purchasers of the Vehicles.

24.     Thus, the Defendants have perpetrated a gross deception on Plaintiffs and members of the proposed Class, who the Defendants told were buying low-emission, efficient, high-performing, dependable vehicles that would maintain high fuel economy.

25.     The Defendants never disclosed to consumers that the Vehicles fail to meet EPA standards and do not result in reduced emission or improved fuel economy. The Defendants never disclosed that they prioritize engine power and profits over the environment and people's time and money. The Defendants never disclosed that the Vehicles' emissions materially exceed the emissions from gasoline-powered vehicles, that the emissions exceed what a reasonable consumer would expect from a purportedly EPA-complaint vehicle, and that emissions materially exceed applicable emissions limits in real world driving conditions. The Defendants never disclosed that their defective SCR system would ultimately cost the consumer several hundred dollars a year because of increased fuel costs, and that they would perform a "silent recall" of the SCR system by flashing the computer but failing to inform the customers.

26.     Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of the Vehicles. Plaintiffs seek damages and

- 14 -

equitable relief for the Defendants' misconduct related to the design, manufacture, marketing, sale, and lease of Vehicles with unlawfully high emissions, as alleged in this Complaint.

27.    The violations of law alleged herein are in two distinct categories. Plaintiffs' RICO allegations are based in part on a pattern of conduct and scheme that include obtaining certificates of compliance for Vehicles that were in fact non-complaint and are illegally on the road. Plaintiffs' state law counts rely on Defendants' deceptive conduct in failing to disclose the polluting nature of the Vehicles and the fact that these Vehicles do not perform as advertised. Plaintiffs' state law claims are not based on a violation of emission standards.

## A.   Jurisdiction and Venue

28.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 & 1332. There is also complete diversity of citizenship in this case because each Defendant is a citizen of a different state than the Plaintiffs and the amount in controversy exceeds the sum of $75,000. 28 U.S.C. § 1332. This Court also has supplemental jurisdiction over the state law claims because those claims are integrally related to the federal claims and form part of the same case and controversy under 28 U.S.C. § 1367.

29.    This Court has personal jurisdiction over FCA by virtue of its transacting and doing business in this District and because FCA is registered to do

- 15 -

business in Michigan. FCA has transacted and done business in the State of Michigan and in this District and has engaged in statutory violations and common law tortious conduct in Michigan and in this District.

30.    This Court has personal jurisdiction over Cummins by virtue of its transacting and doing business in this District and because Cummins is registered to do business in Michigan. Cummins has transacted and done business in the State of Michigan and in this District and has engaged in statutory violations and common law tortious conduct in Michigan and in this District.

31.    Venue is proper pursuant to 28 U.S.C. § 1391(a) & (b) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is proper pursuant to 18 U.S.C. § 1965(a) & (b) because Defendants transact affairs in this District, and the ends of justice require it. Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants reside in this judicial district for venue purposes.

## II.    PARTIES

**A.    Plaintiffs**

32.    Each and every Plaintiff and Class member has suffered an ascertainable loss as a result of the Defendants' omissions and/or misrepresentations associated with the Vehicles, including but not limited to out-

of-pocket loss and future attempted repairs, future additional fuel costs, decreased performance of the Vehicle, and diminished value of the Vehicle.

33.     None of the Defendants, nor any of their agents, dealers, or other representatives informed Plaintiffs or Class members of the existence of the comparatively and unlawfully high emissions and/or defective nature of the Vehicles prior to purchase.

34.     Each of the Plaintiffs purchased their Vehicles at an FCA-authorized dealership, and each received information about the characteristics, benefits, and quality of the Vehicles at the dealership, as intended by FCA.

### 1.     Jeremy Raymo

35.     Plaintiff Jeremy Raymo (for the purpose of this section, "Plaintiff") is a resident of Michigan domiciled in Columbus, Michigan. On or about November 30, 2014, Plaintiff purchased a 2015 Dodge Ram 2500 (for the purpose of this section, the "Vehicle") in St. Clair, Michigan. Plaintiff purchased and still owns the Vehicle.

36.     Unknown to Plaintiff at the time the Vehicle was purchased, it was equipped with an emissions system that was defective and did not function as advertised, and it emitted pollutants such as NOx at many multiples of emissions more than gasoline-powered vehicles—far in excess of what a reasonable consumer would expect from a truck billed as the "lowest emitting diesel engine

ever produced" and far in excess of the levels allowed by federal law. The Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of the Vehicle.

37.     Since he purchased the truck, and as a result of attempted fixes of the Vehicle (including "flashing" the computer and/or fixing the SCR system), the Vehicle's MPG has dropped approximately 20–25%, resulting in additional out-of-pocket losses that he did not reasonably anticipate, and that a customer would not reasonably anticipate. In particular, Plaintiff drives the Vehicle approximately 15,000 miles a year and the Vehicle's MPG has dropped by approximately three MPG. With a diesel fuel price of about $2.84, the defective emission system costs Plaintiff approximately $1,454 a year. He also has lost about $250 in wages from time spent taking the Vehicle to the dealership for repairs to the emissions system.

38.     FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls, but they did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his Vehicle on the reasonable, but mistaken, belief that his Vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating

- 18 -

characteristics throughout its useful life, including high fuel economy and dependability. Plaintiff selected and ultimately purchased his Vehicle, in part, because of the SCR system, as represented through advertisements and representations made by the Defendants. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency, power, and performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Vehicle had high emissions compared to gasoline vehicles or the fact that the emissions system would break down and not perform as advertised. Had Defendants disclosed this design, and the fact that the Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do (and at a much higher level than a reasonable consumer would expect), emitted unlawfully high levels of pollutants, and would require Plaintiff to pay out-of-pocket costs to fix it and in fuel costs and other out-of-pocket costs, Plaintiff would have received these disclosures, and he would not have purchased the Vehicle or would have paid less for it. In addition, had Plaintiff known that his Vehicle was defective and that Defendants delayed a recall in fixing it, or that it was subject to a "silent" recall that would degrade the performance of his truck further, he would not have purchased the Vehicle, or would have paid less for it.

## 2.      Forrest Poulson

39.     Plaintiff Forrest Poulson (for the purpose of this section, "Plaintiff") is a resident of Alabama domiciled in Fairhope, Alabama. On or about March 1, 2015, Plaintiff purchased a 2015 Dodge Ram 3500 (for the purpose of this section, the "Vehicle"), in Bremen, Georgia.

40.     Unknown to Plaintiff at the time the Vehicle was purchased, it was equipped with an emissions system that was defective and did not function as advertised, and it emitted pollutants such as NOx at many multiples of emissions more than gasoline-powered vehicles—far in excess of what a reasonable consumer would expect from a truck billed as the "lowest emitting diesel engine ever produced" and far in excess of the levels allowed by federal law. The Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of the Vehicle.

41.     Since he purchased the truck, and a result of attempted fixes of the Vehicle (including "flashing" the computer and/or fixing the SCR system), the Vehicle's MPG has dropped approximately 20–25%, resulting in additional out-of-pocket losses that he did not reasonably anticipate, and that a customer would not reasonably anticipate. In particular, Plaintiff drives the Vehicle approximately

25,000 miles a year and the Vehicle's MPG has dropped by approximately five MPG. With a diesel fuel price of about $2.50, the defective emission system costs Plaintiff approximately $750 a year. In addition, after being stranded two hundred miles from home with his trailer after his truck went into limp mode, he incurred an additional $400–$500 in out-of-pocket expenses to pull his trailer home and to switch his loaner vehicle when that vehicle broke down.

42.     FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls, but they did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his Vehicle on the reasonable, but mistaken, belief that his Vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy and dependability. Plaintiff selected and ultimately purchased his Vehicle, in part, because of the SCR system, as represented through advertisements and representations made by the Defendants. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency, power, and performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Vehicle had high emissions compared to gasoline vehicles or

- 21 -

the fact that the emissions system would break down and not perform as advertised. Had Defendants disclosed this design, and the fact that the Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do (and at a much higher level than a reasonable consumer would expect), emitted unlawfully high levels of pollutants, and would require Plaintiff to pay out-of-pocket costs to fix it and in fuel costs and other out-of-pocket costs, Plaintiff would have received these disclosures, and he would not have purchased the Vehicle or would have paid less for it. In addition, had Plaintiff known that his Vehicle was defective and that Defendants delayed a recall in fixing it, or that it was subject to a "silent" recall that would degrade the performance of his truck further, he would not have purchased the Vehicle, or would have paid less for it.

### 3.    Gary Gaster

43.    Plaintiff Gary Gaster (for the purpose of this section, "Plaintiff") is a resident of Pennsylvania domiciled in Glen Mills, Pennsylvania. Plaintiff has purchased three new Dodge Ram Trucks on behalf of his business that he currently owns, as follows: (1) a 2014 Dodge Ram 3500, purchased on April 17, 2014, in Wrightsville, Pennsylvania; (2) a 2015 Dodge Ram 3500, purchased on August 20, 2015, in Wrightsville, Pennsylvania; and (3) a 2016 Dodge Ram 3500, purchased on September 12, 2016, in Wrightsville, Pennsylvania. Plaintiff also purchased on behalf of his business a 2014 Dodge Ram 3500 on April 17, 2014, in Wrightsville,

- 22 -

Pennsylvania (for the purpose of this section, the four vehicles are collectively referred to as "Vehicles").

44.     Unknown to Plaintiff at the time the Vehicles were purchased, they were equipped with an emissions system that was defective and did not function as advertised, and they emitted pollutants such as NOx at many multiples of emissions more than gasoline-powered vehicles—far in excess of what a reasonable consumer would expect from a truck billed as the "lowest emitting diesel engine ever produced" and far in excess of the levels allowed by federal law. The Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Vehicles without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of the Vehicles. As detailed above, the trade-in he was forced to conduct cost him approximately $5,000 in accessories he installed on the Vehicle that he lost, plus at least $2,100 in taxes and additional fees in purchasing the Ford.

45.     FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls, but they did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his Vehicles on the reasonable, but mistaken, belief that his Vehicles were each a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be

- 23 -

legally operated within the United States, and would retain all of their operating characteristics throughout their useful life, including high fuel economy and dependability. Plaintiff selected and ultimately purchased his Vehicles, in part, because of the SCR system, as represented through advertisements and representations made by the Defendants. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency, power, and performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Vehicles had high emissions compared to gasoline vehicles or the fact that the emissions system would break down and not perform as advertised. Had Defendants disclosed this design, and the fact that the Vehicles actually emitted pollutants at a much higher level than gasoline vehicles do (and at a much higher level than a reasonable consumer would expect), emitted unlawfully high levels of pollutants, and would require Plaintiff to pay out-of-pocket costs to fix them and in fuel costs and other out-of-pocket costs, Plaintiff would have received these disclosures, and he would not have purchased the Vehicles or would have paid less for them. In addition, had Plaintiff known that his Vehicles were defective and that Defendants delayed a recall in fixing them, or that they were subject to a "silent" recall that would degrade the performance of his trucks

- 24 -

further, he would not have purchased the Vehicles, or would have paid less for them.

### 4.    Brendon Goldstein

46.    Plaintiff Brendon Goldstein (for the purpose of this section, "Plaintiff") is a resident of Florida domiciled in Palm Harbor, Florida. On or about February 15, 2015, Plaintiff purchased a 2015 Dodge Ram 3500 (for the purpose of this section, the "Vehicle"), in Clearwater, Florida.

47.    Unknown to Plaintiff at the time the Vehicle was purchased, it was equipped with an emissions system that was defective and did not function as advertised, and it emitted pollutants such as NOx at many multiples of emissions more than gasoline-powered vehicles—far in excess of what a reasonable consumer would expect from a truck billed as the "lowest emitting diesel engine ever produced" and far in excess of the levels allowed by federal law. The Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of the Vehicle.

48.    Since he purchased the truck, and a result of attempted fixes of the Vehicle (including "flashing" the computer and/or fixing the SCR system), the Vehicle's MPG has dropped approximately 20–25%, resulting in additional out-of-

- 25 -

pocket losses that he did not reasonably anticipate, and that a customer would not reasonably anticipate. In particular, Plaintiff drives the Vehicle approximately 22,000 miles a year and the Vehicle's MPG has dropped by approximately six MPG. With a diesel fuel price of about $2.50, the defective emission system costs Plaintiff approximately $763 a year.

49.     FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls, but they did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his Vehicle on the reasonable, but mistaken, belief that his Vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy and dependability. Plaintiff selected and ultimately purchased his Vehicle, in part, because of the SCR system, as represented through advertisements and representations made by the Defendants. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency, power, and performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Vehicle had high emissions compared to gasoline vehicles or the fact that the emissions system would break down and not perform as

advertised. Had Defendants disclosed this design, and the fact that the Vehicle

actually emitted pollutants at a much higher level than gasoline vehicles do (and at

a much higher level than a reasonable consumer would expect), emitted unlawfully

high levels of pollutants, and would require Plaintiff to pay out-of-pocket costs to

fix it and in fuel costs and other out-of-pocket costs, Plaintiff would have received

these disclosures, and he would not have purchased the Vehicle or would have paid

less for it. In addition, had Plaintiff known that his Vehicle was defective and that

Defendants delayed a recall in fixing it, or that it was subject to a "silent" recall

that would degrade the performance of his truck further, he would not have

purchased the Vehicle, or would have paid less for it.

### 5.    Manuel Pena

50.    Plaintiff Manuel Pena (for the purpose of this section, "Plaintiff") is a

resident of Florida domiciled in Eustis, Florida. On or about December 26, 2013,

Plaintiff purchased a 2013 Dodge Ram 2500 (for the purpose of this section, the

"Vehicle"), in Davie, Florida.

51.    Unknown to Plaintiff at the time the Vehicle was purchased, it was

equipped with an emissions system that was defective and did not function as

advertised, and it emitted pollutants such as NOx at many multiples of emissions

more than gasoline-powered vehicles—far in excess of what a reasonable

consumer would expect from a truck billed as the "lowest emitting diesel engine

ever produced" and far in excess of the levels allowed by federal law. The Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of the Vehicle.

52.     Since he purchased the truck, and a result of attempted fixes of the Vehicle (including "flashing" the computer and/or fixing the SCR system), the Vehicle's MPG has dropped approximately 20–25%, resulting in additional out-of-pocket losses that he did not reasonably anticipate, and that a customer would not reasonably anticipate. In particular, Plaintiff drives the Vehicle approximately 20,000 miles a year and the Vehicle's MPG has dropped by approximately five MPG. With a diesel fuel price of about $2.45, the defective emission system costs Plaintiff approximately $538 a year. In addition, Plaintiff incurred approximately $50 in unreimbursed fuel costs when his truck broke down 250 miles from home while taking his family to Disneyland.

53.     FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls, but they did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his Vehicle on the reasonable, but mistaken, belief that his Vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally

010684-11 967802 V1

operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy and dependability. Plaintiff selected and ultimately purchased his Vehicle, in part, because of the SCR system, as represented through advertisements and representations made by the Defendants. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency, power, and performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Vehicle had high emissions compared to gasoline vehicles and the fact that the emissions system would break down and not perform as advertised. Had Defendants disclosed this design, and the fact that the Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do (and at a much higher level than a reasonable consumer would expect), emitted unlawfully high levels of pollutants, and would require Plaintiff to pay out-of-pocket costs to fix it and in fuel costs and other out-of-pocket costs, Plaintiff would have received these disclosures, and he would not have purchased the Vehicle or would have paid less for it. In addition, had Plaintiff known that his Vehicle was defective and that Defendants delayed a recall in fixing it, or that it was subject to a "silent" recall that would degrade the performance of his truck further, he would not have purchased the Vehicle, or would have paid less for it.

- 29 -

## B.   Defendants

54.   Defendant FCA US LLC (FCA) is a limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by holding company Fiat Chrysler Automobiles N.V., a Dutch corporation headquartered in London, United Kingdom. FCA's principal place of business and headquarters is in Auburn Hills, Michigan, in the Eastern District of Michigan.

55.   FCA (sometimes referred to as Chrysler) is a motor vehicle "manufacturer" and a licensed "distributor" of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA's Chrysler brand is one of the "Big Three" American automobile brands. FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division. As of 2015, FCA is the seventh largest automaker in the world by unit production.

56.   FCA's business operations in the United States include the manufacture, distribution, and sale of motor vehicles and parts through its network of independent, franchised motor vehicle dealers. FCA is engaged in interstate commerce in that it sells vehicles through this network located in every state of the United States.

57.     FCA sells its trucks through FCA franchise dealerships. FCA distributes information about its Ram trucks to its dealers for the purpose of passing that information to consumers. FCA also understands that its dealers pass on information from FCA about the characteristics, benefits, and quality of its Ram products to consumers. The dealers act as FCA's agents in selling the Vehicles and disseminating information about the Vehicles to customers and potential customers. The extent of this agency relationship is exhibited by the insistence by Cummins that FCA participate in the recall, because it was the dealers who would take directions from FCA and complete the work on FCA's behalf. *See infra* Part III.A.7. FCA acknowledges this in the litigation in its willingness to participate in the recall because of its control over the dealerships. *See id.*

58.     Cummins Inc. is a Fortune 500 company that designs, manufactures, and distributes engines, filtration, and power generation products. It earned approximately $19.1 billion in revenue in the year 2015. Cummins is doing business in the Eastern District of Michigan and elsewhere. It conducts business in interstate and foreign commerce through its network of 600 company-owned and independent distributor facilities, supplying its customers with its products, and more than 7,200 dealer locations in over 190 countries and territories. Cummins is headquartered in Columbus, Indiana.

## III.   FACTUAL ALLEGATIONS

**A.    The Environmental Challenges Posed by Diesel Engines and the U.S. Regulatory Response**

59.    The United States government, through the EPA, has passed and enforced laws designed to protect U.S. citizens from pollution and, in particular, certain chemicals and agents known to cause diseases in humans. Automobile manufacturers must abide by these U.S. laws and must adhere to EPA rules and regulations.

60.    The U.S. Clean Air Act has strict emissions standards for vehicles, and it requires vehicle manufacturers to certify to the EPA that the vehicles sold in the United States meet applicable federal emissions standards to control air pollution. Every vehicle sold in the United States must be covered by an EPA-issued Certificate of Conformity (COC).

61.    There is a very good reason that these laws and regulations exist, particularly in regards to vehicles with diesel engines: in 2012, the World Health Organization declared diesel vehicle emissions to be carcinogenic and about as dangerous as asbestos.

62.    Diesel engines pose a particularly difficult challenge to the environment because they have an inherent trade-off between power, fuel efficiency, and emissions: the greater the power and fuel efficiency, the dirtier and more harmful the emissions.

- 32 -

63.     Instead of using a spark plug to combust highly refined fuel with short hydrocarbon chains, as gasoline engines do, diesel engines compress a mist of liquid fuel and air to very high temperatures and pressures, which causes the diesel to spontaneously combust. This allows for a greater compression ratio and longer piston stroke, which produces greater efficiency and engine torque (that is, less fuel consumption and more power).

64.     The diesel engine is able to do this both because it operates at a higher compression ratio than a gasoline engine and because diesel fuel contains more energy than gasoline.

65.     But this greater energy and fuel efficiency come at a cost: diesel produces dirtier and more dangerous emissions. One by-product of diesel combustion is oxides of nitrogen (NOx), which include a variety of nitrogen and oxygen chemical compounds that only form at high temperatures.

66.     NOx is a generic term for the mono-nitrogen oxides NO and NO2 (nitric oxide and nitrogen dioxide), which are predominantly produced from the reaction of nitrogen and oxygen gases in the combustion cylinder during combustion. NOx is produced by the burning of all fossil fuels, but is particularly difficult to control from the burning of diesel fuel in lean-burn conditions (which is the case for nearly all modern on-road diesel engines). NOx is a toxic pollutant that produces smog and causes a litany of environmental and health problems. NOx

- 33 -

pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone. Exposure to these pollutants has been linked to serious health dangers, including asthma attacks and other respiratory illnesses serious enough to send people to the hospital. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory illness are at an increased risk of health effects from these pollutants. NOx can cause breathing problems, headaches, chronically reduced lung function, eye irritation, and corroded teeth. It can indirectly affect humans by damaging the ecosystems they rely on.

67.     The diesel cycle is inherently more efficient than the comparable spark-ignited Otto (gasoline) cycle. In fact, diesel engines can convert over 45% of diesel's chemical energy into useful mechanical energy, whereas gasoline engines convert only 30% of gasoline's chemical energy into mechanical energy. Though more efficient, diesel engines come with their own set of challenges, as emissions from diesel engines can include higher levels of NOx and particulate matter (PM) or soot than emissions from gasoline engines due to the different ways the different fuels combust and the different ways the resulting emissions are treated following combustion. Another way NOx emissions can be reduced is through exhaust gas recirculation or "EGR," whereby exhaust gases are routed back into the intake of

the engine and mixed with fresh incoming air. Exhaust gas recirculation lowers NOx by reducing the available oxygen, increasing the heat capacity of the exhaust gas mixture and by reducing maximum combustion temperatures; however, EGR can also lead to an increase in PM as well. Another way NOx and PM emissions can be reduced is through expensive exhaust gas after-treatment devices—primarily catalytic converters, which use a series of chemical reactions to transform the chemical composition of a vehicle's NOx emissions into less harmful, relatively inert, and nitrogen gas (N2), water (H2O), and carbon dioxide (CO2).

68. Diesel engines thus operate according to this trade-off between price, NOx, and PM, and for the EPA to designate a diesel car as a "clean" vehicle, it must produce both low PM and low NOx. In 2000, the EPA announced stricter emission standards requiring all diesel models starting in 2007 to produce drastically less NOx and PM than years prior. Before introducing a Vehicle into the U.S. stream of commerce (or causing the same), FCA or Cummins was required to first apply for, and obtain, an EPA-administered COC certifying that the vehicle comported with the emission standards for pollutants enumerated in 40 C.F.R. §§ 86.1811-04, 86.1811-09, and 86.1811-10. The Clean Air Act expressly prohibits automakers or engine manufacturers, like FCA and Cummins, from introducing a new vehicle into the stream of commerce without a valid EPA

- 35 -

COC.[22] Moreover, vehicles must be accurately described in the COC application "in all material respects" to be deemed covered by a valid COC.[23] California's emission standards are even more stringent than those of the EPA. California's regulator, CARB, requires a similar application from automakers to obtain an Executive Order, confirming compliance with California's emission regulations, before allowing the vehicle onto California's roads.

### 1.    The Environmental Damage

69.    NOx contributes to ground-level ozone and fine particulate matter. According to the EPA, "Exposure to these pollutants has been linked with a range of serious health effects, including increased asthma attacks and other respiratory illnesses that can be serious enough to send people to the hospital. Exposure to ozone and particulate matter have also been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory disease are particularly at risk for health effects of these pollutants."

70.    The EPA describes the danger of NOx as follows:

---

[22] *See* 42 U.S.C. § 7522(a)(1).

[23] *See* 40 C.F.R. § 86.1848-10(c)(6).

**Acid Rain** - $NO_x$ and sulfur dioxide react with other substances in the air to form acids which fall to earth as rain, fog, snow, or dry particles. Some may be carried by the wind for hundreds of miles. Acid rain damages forests; causes deterioration of cars, buildings, and historical monuments; and causes lakes and streams to become acidic and unsuitable for many fish.



**Water Quality Deterioration** - Increased nitrogen loading in water bodies, particularly coastal estuaries, upsets the chemical balance of nutrients used by aquatic plants and animals. Additional nitrogen accelerates "eutrophication," which leads to oxygen depletion and reduces fish and shellfish populations. $NO_x$ emissions in the air are one of the largest sources of nitrogen pollution to the Chesapeake Bay.



010684-11 967802 V1



**Toxic Chemicals** - In the air, $NO_x$ reacts readily with common organic chemicals, and even ozone, to form a wide variety of toxic products, some of which may cause biological mutations. Examples of these chemicals include the nitrate radical, nitroarenes, and nitrosamines.

**Ground-level Ozone (Smog)** - is formed when $NO_x$ and volatile organic compounds (VOCs) react in the presence of heat and sunlight. Children, the elderly, people with lung diseases such as asthma, and people who work or exercise outside are susceptible to adverse effects such as damage to lung tissue and reduction in lung function. Ozone can be transported by wind currents and cause health impacts far from the original sources. Millions of Americans live in areas that do not meet the health standards for ozone. Other impacts from ozone include damaged vegetation and reduced crop yields.



- 38 -



**Particles** - $NO_x$ react with ammonia, moisture, and other compounds to form nitric acid vapor and related particles. Human health concerns include effects on breathing and the respiratory system, damage to lung tissue, and premature death. Small particles penetrate deeply into sensitive parts of the lungs and can cause or worsen respiratory disease, such as emphysema and bronchitis, and aggravate existing heart disease.



**Global Warming** - One member of the $NO_x$ family, nitrous oxide, is a greenhouse gas. It accumulates in the atmosphere with other greenhouse gases causing a gradual rise in the earth's temperature. This will lead to increased risks to human health, a rise in the sea level, and other adverse changes to plant and animal habitat.

71.     On September 19, 2015, scientists at Northwest University Feinberg School of Medicine and Columbia University's Mailman School of Public Health released a study indicating that the elevated emissions from the non-compliant Volkswagen vehicles could lead to as many as 50 premature deaths, 3,000 lost workdays, and $423 million in economic costs.

### 2.      The Worldwide Emissions Scandal

72.     As noted, it was eventually revealed that Volkswagen had manufactured over 11 million cars that were on the road in violation of European emissions standards, and over 480,000 vehicles were operating in the United States

- 39 -

in violation of EPA and state standards. But Volkswagen was not the only manufacturer of vehicles that exceeded emissions standards.

73.     In May 2015, a study conducted on behalf of the Dutch Ministry of Infrastructure and the Environment found that all sixteen vehicles made by a variety of manufacturers, when tested, emitted significantly more NOx on real world trips while they passed laboratory tests. The TNO Report concluded that "[i]n most circumstances arising in normal situations on the road, the system scarcely succeeded in any effective reduction of NOx emissions."

74.     In the summary report, TNO graphically depicted the widespread failure of most manufacturers:



75.     In the wake of a major scandal involving Volkswagen and Audi diesel

vehicles evading emissions standards with the help of certain software that

manipulates emissions controls (called "defeat devices"),[24] scientific literature and

---

[24] See Exhibit 14, the EPA's Notice of Violation to Volkswagen (Sept. 18, 2015), available at https://www.epa.gov/sites/production/files/2015-10/documents/vw-nov-caa-09-18-15.pdf. As detailed in the Notice of Violation, software in Volkswagen and Audi diesel vehicles detects when the vehicle is

reports and testing indicate that most of the diesel car manufactures of so-called "clean diesel" vehicles emit far more pollution on the road than in lab tests. The EPA has widened its probe of auto emissions to include, for example, the Mercedes E250 BlueTEC.

76.     The TNO Report found that the current system for testing cars in a laboratory produces "meaningless results."

77.     TNO further remarked: "It is remarkable that the NOx emission under real-world conditions exceeds the type approval value by [so much]. It demonstrates that the settings of the engine, the EGR and the SCR during a real-world test trip are such that they do not result in low NOx emissions in practice. In other words: *In most circumstances arising in normal situations on the road, the systems scarcely succeed in any effective reduction of NOx emissions*" (emphasis added). The lack of any "effective reduction of NOx emissions" is a complete contradiction of Defendants' claim that their Vehicles are clean.

78.     Other organizations are beginning to take notice of the emissions deception. The Transportation and Environment (T&E) organization, a European group aimed at promoting sustainable transportation, compiled data from

---

undergoing official emissions testing and turns full emissions controls on only during the test. But otherwise, while the vehicle is running, the emissions controls are suppressed. This results in cars that meet emissions standards in the laboratory or state testing station, but during normal operation they emit NOx at up to 40 times the standard allowed under U.S. laws and regulations. Volkswagen has admitted to installing a defeat device in its diesel vehicles.

"respected testing authorities around Europe." T&E stated in September 2015 that real-world emissions testing showed drastic differences from laboratory tests such that models tested emitted more pollutants on the road than in their laboratory tests. "For virtually every new model that comes onto the market the gap between test and real-world performance leaps," the report asserts.

79.    Emissions Analytics is a U.K. company that says it was formed to "overcome the challenge of finding accurate fuel consumption and emissions figures for road vehicles." With regard to its recent on-road emissions testing, the company explains: "[I]n the European market, we have found that real-world emissions of the regulated nitrogen oxides are four times above the official level, determined in the laboratory. Real-world emissions of carbon dioxide are almost one-third above that suggested by official figures. For car buyers, this means that fuel economy on average is one quarter worse than advertised. This matters, even if no illegal activity is found."

### 3.    The Emissions Trading System

80.    Under EPA regulations, engine manufacturers may earn emissions credits equal to their emissions limit, less the amount of emissions produced by the engines.[25] An engine manufacturer may average, bank, and trade these emissions

---

[25] *See* Exhibit 15, *What is Emissions Trading?*, EPA, https://www.epa.gov/emissions-trading-resources/what-emissions-trading, at 1 (last accessed June 29, 2017).

credits.[26] To "average" credits means the engine manufacturer can use its

emissions credits from one engine model and apply it to another engine model—

effectively allowing the "clean" engine to pay for the dirty engine.[27] Banking

credits allows an engine manufacturer to save their emissions credits for future

years.[28] In some cases, engine manufacturers can use their credits retrospectively,

to offset previous engines that exceeded their emissions levels.[29] Finally, engine

manufacturers can trade and sell these emissions credits, either privately or on the

open market.[30]

81.     According to the EPA, this system was designed to offer "flexibility

for individual emissions sources to tailor their compliance path to their needs" and

"incentive[s] for early pollution reductions as a result of the ability to bank surplus

allowances."[31] The EPA concludes that, "[u]nder the right circumstances,

emissions trading programs have proven to be extremely effective. They can

achieve substantial reductions in pollution while providing accountability and

transparency . . . ."[32]

---

[26] *See* 40 C.F.R. § 1036.701(a).

[27] *See* 40 C.F.R. § 1036.710.

[28] *See* 40 C.F.R. § 1036.715.

[29] *See id.*

[30] *See* 40 C.F.R. § 1036.720.

[31] Exhibit 15 at 1.

[32] *Id.* at 2.

- 44 -

82.     Falsely claiming to obtain reduced emission levels undermines this system. By using fraudulently obtained emissions credits for dirty engines, it increases the pollutants in the air and shifts the cost of emissions compliance from the owners of vehicles with dirty engines to the owners of vehicles with clean engines. According to the TruckTrend website:[33]

> Dodge made a decisive move to head off 2010 emissions regulations at the pass. By increasing the [Cummins 6.7L engine], the company was able to meet the upcoming 2010 standards early. This allowed Chrysler to build up EPA emissions credits that could be used during future model years. During the later part of the '07 model year, GM introduced the 6.6L Duramax LMM engine, which made 365 hp and 660 lb-ft, even with the addition of a DPF.

Upon information and belief, Cummins either gave or sold FCA the credits to allow FCA to use a more powerful engine that released more emissions.

### 4.     Cummins' Entry into the Clean-Diesel Market

83.     Cummins, founded by Clessie Lyle Cummins, has been developing diesel engines since 1919.[34]

84.     Cummins has a long history with Dodge, having supplied diesel engines for the manufacturer since 1988.[35]

---

[33] Exhibit 16, *A Decade of Cummins, Duramax, and Power Stroke Diesel Engines*, TruckTrend, (June 15, 2015), http://www.trucktrend.com/features/1507-a-decade-of-cummins-duramax-and-power-stroke-diesel-engines/, at 5.

[34] Exhibit 17, *Cummins History*, https://cumminsengines.com/history (last accessed June 30, 2017).

- 45 -

85.     In 1990, the EPA amended its air pollution standards under the Clean Air Act, which addressed diesel emissions.[35]

86.     In 1998, the Department of Justice, on behalf of the EPA, sued every diesel manufacturer in the United States, including Cummins, for installing "defeat" devices on their engines.[37] The companies were forced to spend a combined one billion dollars, including an $83.4 million civil penalty, to bring their engines into conformity with national standards.[38]

87.     But Cummins continued to ship out engines without pollution control equipment through 2006, for which it would pay an additional $2.1 million settlement with the Department of Justice in 2010.[39]

---

[35] Exhibit 18, Cummins News Release, *Cummins Reveals Best-In-Class 2007 Turbo Diesel Engine* (Jan. 23, 2007), available at http://investor.cummins.com/phoenix.zhtml?c=112916&p=irol-newsArticle_pf&ID=953050.

[36] Exhibit 19, *Regulatory Authorities*, DieselNet, https://www.dieselnet.com/standards/us/ (last accessed June 30, 2017).

[37] Exhibit 20, *Company Charged With Illegal Emissions From Diesel Engines* U.S. Dep't of Justice (June 16, 1998), available at https://www.justice.gov/archive/opa/pr/1998/June/281.html.

[38] *See* Exhibit 21, Raphael Orlove, *How The EPA Won $1 Billion From Diesel Cheaters Long Before VW*, Jalopnik (Sept. 21, 2015), http://jalopnik.com/how-the-epa-won-1-billion-from-diesel-cheaters-long-be-1732109485.

[39] *See* Exhibit 22, *Cummins Inc. Agrees to Pay $2.1 Million Penalty for Diesel Engine Clean Air Act Violations*, U.S. Dep't of Justice (Feb. 22, 2010), available at https://www.justice.gov/opa/pr/cummins-inc-agrees-pay-21-million-penalty-diesel-engine-clean-air-act-violations.

88.     As the EPA began to roll out increasingly tougher standards to take effect in 2004, 2007, and 2010, Cummins began developing its own clean diesel technology.

89.     Between 2002 and 2007, Cummins increased its Research & Development budget by 60 percent, to $321 million, with almost a quarter dedicated to meeting the new emission standards.[40] More specifically, it expanded its component segment budget, which included emissions-related technologies, from $39 million in 2004 to $57 million in 2006. The emphasis was on developing its own system based on its own proprietary parts.

90.     In 2006, Cummins spent $720,000 lobbying Congress on the "development of diesel technology for heavy and light duty trucks."[41]

91.     In September 2006, Cummins unveiled its 6.7-liter Turbo Diesel engine.[42]

---

[40] *See* Exhibit 23, *Cummins: An engine maker bets on clean air—and wins* (June 8, 2015), Fortune, http://fortune.com/2015/06/08/cummins-diesel-engine/.

[41] Exhibit 24, *Lobbying Report* (Aug. 14, 2006), available at http://soprweb. senate.gov/index.cfm?event=getFilingDetails&filingID=8FE6A473-F9E5-4951-BD7F-6019C32510AE&filingTypeID=3.

[42] Exhibit 25, *Dodge Introduces Cleaner, Quieter and More Powerful 6.7-liter Cummins Turbo-Diesel Engine at State Fair of Texas*, PR Newswire (Sept. 28, 2006), http://www.prnewswire.com/news-releases/dodge-introduces-cleaner-quieter-and-more-powerful-67-liter-cummins-turbo-diesel-engine-at-state-fair-of-texas-57203457.html.

92.     By 2015, in addition to its engines, Cummins controlled 41 percent of the U.S. market on aftermarket diesel cleaning technologies.[43] It is the leading diesel engine manufacturer in the United States and one of the biggest in the world.[44] Riding the wave of the "clean" diesel engine campaign, its sales jumped from $10.8 billion in 2009 to $19.2 billion in 2014.

### 5.     Dodge and Cummins Jointly Develop and Promote the Vehicles

93.     FCA and Cummins moved aggressively to promote the Vehicles and to emphasize the strength of the relationship between the two companies. Indeed, from 2007 to 2016, they have jointly worked on eight separate emissions-related recalls of the 2500 and 3500 trucks.[45]

94.     Below is a selection of public statements made by both FCA and Cummins as part of an orchestrated campaign by each defendant to promote their "green" image, to sell the Vehicles as a cleaner and more economical alternative for customers looking to purchase heavy-duty trucks, and to promote their partnership with each other.

95.     Statements by Cummins include the following:

---

[43] Exhibit 23 at 9.

[44] *See id.*

[45] FCA Litigation, Complaint and Jury Demand (ECF No. 1) at 6.

- An advertising brochure published in 2015 regarding Cummins'

engines, entitled "Top 10 Ways Cummins Is Redefining Value":[46]

> Superior Fuel Economy[.] Cummins offers leading fuel
> economy for a lower cost of operation. . . .
>
> SmartAdvantage Powertrain[.] The smart way to get 3–
> 6% better fuel economy. Cummins and Eaton have joined
> together to deliver a fully integrated powertrain with
> unprecedented performance and fuel economy. . . .
>
> Single Module Aftertreatment[.] Cummins Emission
> Solutions has developed an ultra high efficiency
> aftertreatment system that takes up less space and is
> easier to install and simpler to maintain. . . .

- Cummins' website:[47]

> Working closely to integrate with Ram, a more
> aggressive calibration for the Cummins 6.7L Turbo
> Diesel produces an additional 15 lb.-ft. of torque. This
> improvement places the coveted engine ahead of the
> competition with 865 lb.-ft. of torque, while maintaining
> performance *and EPA compliance*.

- Cummins' YouTube channel, in a video referring to its Jamestown,

New York plant:[48]

> [The] plant not only creates environmentally clean
> engines, but is also designed with a low carbon
> footprint . . . .

---

[46] Exhibit 27, *Top 10 Ways Cummins Is Redefining Value*, Cummins (2015), available at https://cumminsengines.com/brochure-download.aspx?download=true&brochureid=512.

[47] Exhibit 11 (emphasis added).

[48] CumminsEngines, *Inside Cummins: This is Jamestown (2016)*, YouTube (Mar. 17, 2016), https://www.youtube.com/watch?v=zS4STkQDWM4.

- 49 -

> All in all the Jamestown plant is a truly remarkable place, building truly remarkable engines—engines that deliver better performance, better fuel economy, and better reliability while being better for the environment.

- Cummins' YouTube video entitled "Inside Cummins: This is Cummins":[49]

> Demanding that everything we do leads to a cleaner, healthier, safer environment. . . .
>
> Emissions control was and will be a key component of the product profile of every product we produce. Now, fortunately for Cummins we have seen emissions compliance really as a means to creative and new technologies. Our engineers every day are challenged to create solutions for the customer and for the environment. Now whenever it appears that both of these masters cannot be served with the current technology, we are really well-prepared with skill and tools to pioneer new systems. Our company demands that everything we do leads to a cleaner, healthier, safer environment.

- Cummins' YouTube video entitled "Cummins: Understanding What We Do":[50]

> Today the engine remains critical to what we do and serves as a platform for the development of cutting-edge technology. We use this technology to maximize fuel economy and minimize emissions while still maintaining the power and dependability our customers expect. . . .

---

[49] CumminsEngines, *Inside Cummins: This is Cummins*, YouTube (Sept. 10, 2012), https://www.youtube.com/watch?v=L5Mogpt-Hsg.

[50] CumminsCareers, *Cummins: Understanding What We Do*, YouTube (Sept. 3, 2014), https://www.youtube.com/watch?v=SIsFBIX_BFA.

- 50 -

Our expanding emissions solutions business has been essential in Cummins' transition into a technology development company. For example, take a look at the amazing chemistry and reactions that happen inside our ultra low emissions systems containing a diesel oxidation catalyst coupled with a diesel particulate filter and selective catalytic reduction system. . . .

That's why we are the global leader in designing, manufacturing, and integrating exhaust after-treatment technology. . . .

To be successful, we must anticipate our customers' needs before our competition. For the past several years, emissions regulations played a prominent role in our product development. Now, *with emissions near zero*, our focus is changing. . . .

The technology we develop and deliver allows us to provide more power and increase fuel economy while minimizing the impact on the environment. Because we care about our communities and sustainability, we rebuild and reuse our products and offer the cleanest technology. In our facilities we reduce energy use and recycle to meet our mission of demanding that everything we do leads to a cleaner, healthier, and safer environment.

- Cummins' YouTube video entitled "The Cummins Aftertreatment System - Driver Training for On-Highway Heavy-Duty Truck Engines":[51]

Cummins engines use clean diesel technology which leads to *near zero emissions*. . . .

---

[51] CumminsEngines, *The Cummins Aftertreatment System - Driver Training for On-Highway Heavy-Duty Truck Engines*, YouTube (July 11, 2016), https://www.youtube.com/watch?v=FlG3GSxORew&index=13&list=PLqbUCAKgU5jC40a7Lwq-aC-JZsksenpkZ.

- 51 -

The Cummins after-treatment system allows your truck
to comply with federal laws covering exhaust
emissions. . . .

96.     Statements by FCA include the following:

•     After completing two million trucks together, FCA's Fred Diaz

(President and CEO, Ram Truck Brand and Chrysler de Mexico) stated in a news

release the following:[52]

The Ram Truck-Cummins diesel partnership is one of the
industry's most enduring and certainly fitting of such a
tribute . . . . Both companies have benefited greatly, but
Ram diesel customers are the real beneficiaries. Every
day they experience the toughness and capability a
Cummins-powered Ram can deliver.

•     The 2013 Ram brochure proclaimed:[53]

The facts speak decisively: with over two million
applications of a Cummins Turbo Diesel in a Ram truck,
the history of this exceptional powertrain delivers
capability and reliability second to none.

•     2016 Ram 2500/3500 brochure:[54]

Cummins + Ram Heavy Duty. It's a working
combination that's now in excess of two million
applications—the ever-growing figure that sums up the
enduring quality of this working partnership.

---

[52] Exhibit 26, *Two-Millionth Cummins Pickup Engine Rolls off Line for
Chrysler*, Cummins, http://social.cummins.com/two-millionth-cummins-pickup-
engine-rolls-line-chrysler/ (last accessed June 30, 2017).

[53] Exhibit 5 at 6.

[54] Exhibit 28, Ram 2500/3500 brochure (2016) at 9, available at
http://www.fcaworkvehiclesus.com/assets/downloads/brochures/ramtrucks/2016/1
6MY_US_Ram_HD_eBrochure.pdf.

- 52 -

- Ram's website:[55]

  Ram Heavy Duty trucks are built to last for years to come, having endured upwards of 40,000 hours of intense vehicle system testing in the harshest scenarios on and off the road. Proven power and rugged capability combine to keep your truck going for as long as you do.

- Ram's website:[56]

  Available Proven and Legendary 6.7L Cummins® Turbo Diesel I6 engine with Class-Exclusive Smart Diesel Exhaust Brake. . . .

  [The 2500 truck is the] epitome of reliability.

- Ram's website:[57]

  Combine world-class capability with outstanding performance and you've got the available Proven and Legendary 6.7L Cummins® Turbo Diesel I6 engine. With a wide array of Best-in-Class and Class-Exclusive features and capabilities, the 6.7L Cummins engine turns your Ram 2500 into a dependable powerhouse.

---

[55] Exhibit 29, *Ram 2500*, Ramtrucks, https://www.ramtrucks.com/ram-2500.html/ (last accessed June 30, 2017).

[56] Exhibit 30, *America's Longest-Lasting Pickups*, Ramtrucks, https://www.ramtrucks.com/americas-longest-lasting.html (last accessed June 30, 2017).

[57] Exhibit 31, *Powertrain*, Ramtrucks, https://www.ramtrucks.com/ram-2500/powertrain.html (last accessed June 30, 2017).

- 53 -

- 2013 Ram sales brochure:[58]

  There's only one way to get it done—and that's doing everything the right way. New 2013 Ram 2500/3500 empower you with fluent ease. . . . Even the classic Ram job-rated attitude has evolved—giving you new maximum capability without compromise, and further backed with a raft of best-in-class attributes. The work just got easier—because these workers are the strongest in our history. . . .

  A completely new approach to this design gives you exactly what a work truck should be: exceptional power, the capability to pull off heavy-duty assignments with confidence, and head-turning good looks.

- 2014 Ram sales brochure:[59]

  [T]his is a truck that can take a beating while knocking down jobs with no punch list in site.

- 2015 Ram brochure:[60]

  HEAVYWEIGHT PERFORMANCE. HEAVY-DUTY EFFICIENCY. AND EXCEPTIONALLY HEAVY ON COMFORT. This is where you come when the job goes beyond the ordinary—because the 2015 Ram Heavy Duty 2500/3500 models are all about the work. . . .

  [The Cummins Turbo Diesel engine is] [v]irtually indestructible in design.

---

[58] Exhibit 5 at 3, 15.

[59] Exhibit 32, Ram brochure (2014) at 26, available at https://www.ramtrucks.com/assets/pdf/brochures/2014_ram_pickups.pdf (last accessed June 30, 2017).

[60] Exhibit 33, Ram brochure (2015) at 3, 5, available at http://cdn.dealereprocess.com/cdn/brochures/ram/2015-3500.pdf (last accessed June 30, 2017).

- 54 -

- 2017 Ram brochure:[61]

  The Cummins Turbo Diesel and Ram Heavy Duty. Over nearly three decades, this working combination has figured into more than two million applications—and it's an ever-growing figure that sums up the enduring quality of this unbeatable partnership.

97.     FCA in particular also marketed the Vehicles specifically for people who relied on them for work. The promotional materials are replete with both images and words geared toward selling workers on using their trucks. Here are images from its 2013 sales brochure, with the tagline "NEW MAX CAPABILITY GETS THE JOB DONE":[62]



---

[61] Exhibit 34, Ram brochure (2017) at 10, available at https://www.ramtrucks.com/assets/pdf/brochures/US%20-%2017MY%20Ram%20HD%20Catalog_TX_eBrochure.pdf (last accessed June 30, 2017).

[62] Exhibit 5.

- 55 -











The brochure also states the following:[63]

> There's only one way to get it done—and that's doing everything the right way. New 2013 Ram 2500/3500 empower you with fluent ease. For 2013, these tough new Ram Heavy Duty pickups have been transformed into beefier, more capable, and more technologically advanced workers than ever. Even the class Ram job-rated attitude has evolved—giving you new maximum capability without compromise, and further backed with a raft of best-in-class attributes. The work just got easier —because these workers are the strongest in our history.

---

[63] *Id.* at 3.

010684-11 967802 V1

98.     The sales brochures for 2014–2017 contain similar work-related images and similar representations about the reliability and durability of Ram trucks for workers. For example:

- 2014 sales brochure:[64]

  THE BOLDEST WORK BEST WITH A HEAVY-DUTY ATTITUDE.

  It's a promise that's poured into the mold of the Heavy Duty badge itself: this is a truck that can take a beating while knocking down jobs with no punch list in sight. . . .

  These trucks have a history of arriving on job sites and ranches with a certain amount of attitude—and they have a stronger history of backing it up.

- 2015 sales brochure:[65]

  HEAVYWEIGHT PERFORMANCE. HEAVY-DUTY EFFICIENCY. AND EXCEPTIONALLY HEAVY ON COMFORT.

  This is where you come when the job goes beyond the ordinary—because the 2015 Ram Heavy Duty 2500/3500 models are all about the work. From hauling your boat or a trailer through mountains to ranching to managing a business, these workhorses are designed to deliver across the board, day-in and year-out.

- 2016 sales brochure:[66]

  ONE TOOL IS DESIGNED TO MASTER EVERY JOB OUT THERE.

---

[64] Exhibit 32 at 26.

[65] Exhibit 33 at 3.

[66] Exhibit 28 at 2-5.

- 59 -

THIS TRUCK . . . DOES IT ALL.

JOB-RELATED CAPABILITY.

FROM HEAD TO TOE, IT'S MADE TO TOW.

- 2017 sales brochure:[67]

SOME STRENGTHS YOU WEIGH. OTHERS YOU COUNT. SO COUNT ON RAM HEAVY DUTY FOR THE BIG JOBS.

Leadership is defined by the just-right working combination of brains and brawn . . . . [T]hese powerhouses are ready and willing to work taking on everything you put in front of them . . . .

99.     What is remarkable about these advertisements and self-serving

statements is that they continued to make them even after their falsity was proven.

The following are statements that Defendants made (including the date when they

were available online) as captured on the Internet Archive website

(www.archive.org)—a website that captures historical webpages:

- Ram statement about Cummins (captured August 10, 2015):[68]

With B20 biofuel capability and reduced greenhouse gas emissions, our engineers were proud to build a lineup around an engine that's as responsible as it is powerful.

- From the Cummins website (captured on March 7, 2016):[69]

---

[67] Exhibit 34 at 4.

[68] Exhibit 12.

[69] Exhibit 35, *Cummins Engines for Medium-Duty Truck*, Cummins, available at https://web.archive.org/web/20160307105606/http://cumminsengines.com:80/medium-duty-truck (captured Mar. 7, 2016).

- 60 -

Cummins designs, develops and supports every critical component from air handling to exhaust aftertreatment as a totally integrated system. This allows us to optimize every function better than any other engine manufacturer.

The ISL9 and ISB6.7 meet 2014 Environmental Protection Agency (EPA) and United States Department of Transportation (DOT) regulations for fuel economy and greenhouse gas reduction a year ahead of schedule without major hardware changes.

### 6.    The Defendants' Emissions Deceptions

100.   As referenced above, on January 12, 2017, the EPA issued a Notice of Violation against Fiat Chrysler Automobiles N.V. and FCA US LLC for failing to justify or disclose defeat devices in model year 2014–2016 Dodge Ram 1500 EcoDiesel and 2014–2016 Jeep Grand Cherokee EcoDiesel vehicles.[70] The EPA is currently working in coordination with the California Air Resources Board (CARB) to investigate FCA, which has also issued a notice of violation to FCA.[71] The U.S. Department of Justice subsequently sued FCA when attempts to negotiate a settlement failed.[72]

101.   The Notice of Violation is based in part on emissions testing performed by the EPA at the National Vehicle and Fuel Emissions Laboratory. The EPA performed this testing "using driving cycles and conditions that may

---

[70] Exhibit 3.

[71] Exhibit 4.

[72] *See United States of America v. FCA US LLC et al.*, No. 5:17-cv-11633-JCO-EAS (E.D. Mich.).

- 61 -

reasonably be expected to be encountered in normal operation and use for the purposes of investigating a potential defeat device."[73]

102.   The EPA identified at least eight Auxiliary Emissions Control Devices (AECDs) in the Vehicles:

- AECD 1 (Full Exhaust Gas Recirculation (EGR) Shut-Off at Highway Speed)

- AECD 2 (Reduced EGR with Increasing Vehicle Speed)

- AECD 3 (EGR Shut-off for Exhaust Valve Cleaning)

- AECD 4 (Diesel Exhaust Fluid Dosing Disablement during SCR[74] Adaptation)

- AECD 5 (EGR Reduction due to Modeled Engine Temperature)

- AECD 6 (SCR Catalyst Warm-Up Disablement)

- AECD 7 (Alternative SCR Dosing Modes)

- AECD 8 (Use of Load Governor to Delay Ammonia Refill of SCR Catalyst)

103.   EPA testing found that "some of these AECDs appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emission standards using the Federal emission test procedure (e.g., FTP, US06) than in normal operation and use."[75] For example:

---

[73] Exhibit 3.

[74] Selective Catalytic Reduction ("SCR") is an emissions control system that injects diesel exhaust fluid through a special catalyst into the exhaust stream of a diesel engine.

[75] Exhibit 3.

a.  AECD 3, when combined with either AECD 7 or AECD 8, disables the EGR system without increasing the effectiveness of SCR system. Under some normal driving conditions, this disabling reduces the effectiveness of the overall emission control system. The AECD 3 uses a timer to shut off the EGR, which does not appear to the EPA to meet any exceptions to the regulatory definition of "defeat device."

b.  AECD 5 & 6 together reduce the effectiveness of the NOx emissions control system, using a timer to discontinue warming of the SCR after treatment system, which reduces its effectiveness.

c.  AECD 4, particularly when combined with AECD 8, increases emissions of tailpipe NOx during normal vehicle operation and use. The operation of AECD 1, AECD 2, and/or AECD 5 increases the frequency of occurrence of AECD 4.

d.  AECDs 7 & 8 work together to reduce NOx emissions during variable-grade and high-load conditions.

104.  The EPA further found that FCA did not disclose or justify these control devices in their Certificate of Conformity applications, as required by EPA regulations, and that FCA was in violation of the Clean Air Act each time it sold, offered for sale, introduced in commerce, or imported approximately 103,828 of these EcoDiesel vehicles.

105.   As alleged in a separate lawsuit filed against Defendants in this District, private testing was also performed on a 2012 Dodge Ram 2500 powered by a Cummins 6.7 diesel engine using a portable emission measurement system (PEMS).[76] The vehicle had accumulated approximately 70,000 miles at the time of testing. The results show the vehicle does not meet the relevant emission standards, as follows: during on-road testing designed to simulate the driving profile of the Federal Test Procedure (FTP) certification cycle, emissions were found to be 702 mg/mile on average, 3.5 times the federal and California standard of 200 mg/mile. Over significant distances, emissions were found to be as high as 1,100 to 2,800 mg/mile for periods lasting as long as 21% of the total drive time. That is 5.5 to 14 times the relevant standard. During on-road PEMS testing designed to simulate the driving profile of the Highway certification cycle, average emissions were found to be 756 mg/mile, or 1.9 times the California (and Section 177) state standard. Over significant distances, emissions were found to be as high as 1,200 to 2,250 mg/mile for periods lasting as long as 16% of the total drive time. That equates to 3.0 to 5.6 times the relevant standard.

### 7.   The FCA-Cummins Litigation

106.   As referenced above, years after FCA and Cummins discovered there was a defect in the SCR system, Cummins began the proceedings to recall certain

---

[76] *See Bledsoe et al. v. FCA US LLC et al.*, No. 4:16-cv-14024-TGB-RSW (E.D. Mich.).

2500 trucks (model years 2013–2015), but there was a dispute between the parties about who had to pay for it. The specific issue in the case was the "Diesel Engine Exhaust Aftertreatment System," which included a coated SCR system.[77] On August 5, 2016, under the apparent belief that Cummins would force FCA to pay for the recall, FCA initially sued Cummins for $60 million, the estimated cost for FCA of initiating the recall. As the EPA certificate holder, Cummins was required to complete the recall. According to the Complaint, Cummins designed the SCR in compliance with the contracts between Cummins and FCA. However, the SCR "did not comply with all specifications, statutes, regulations, and other contractual requirements" of the FCA-Cummins contract. As a result, the SCR is "defective."[78]

107. In response, Cummins filed a motion for a temporary restraining order and preliminary injunction.[79] In so doing, Cummins acknowledged that "[c]ertain Ram 2500 Pickup trucks with Cummins 6.7 L diesel engines (the 'Vehicles') suffer an issue that results in the Vehicles *failing to meet emissions requirements*. The Vehicles must be recalled and repaired."[80] Although conceding that "Cummins is the emissions certificate holder for the Vehicles and is responsible to the regulating agencies for the emissions requirements," Cummins nevertheless contended that

---

[77] FCA Litigation, Complaint and Jury Demand (ECF No. 1) at 6.

[78] *Id.* at 5.

[79] FCA Litigation, Cummins' Motion for TRO and Preliminary Injunction (ECF No. 5).

[80] *Id.* at 2.

- 65 -

"FCA refuses to cooperate in the recall, including notifying its dealers and customers of the recall, working with its third party suppliers to obtain the replacements parts, and actually performing the repairs through repairs at its authorized dealers."[81] Moreover, "[o]n September 14, 2016 ARB and EPA informed Cummins that they will issue the rare remedy of ordering a forced recall against Cummins within seven days[.] FCA still refuses to initiate the recall[.]"[82]

108.   In its TRO petition, Cummins stressed that FCA and Cummins had a pattern and practice of cooperating in recalls; in fact, from 2007 to 2016, there have been "*eight* emissions[-]related voluntary recalls of the 2500 and 3500 Ram Pickups."[83] FCA had worked with Cummins in every recall.[84]

109.   According to the contractual relationship between FCA and Cummins, Cummins agreed to supply 6.7L diesel engines to FCA for their model year 2013–2015 Ram 2500 trucks, and the 3500 trucks, and Cummins would hold the emissions certificates.[85] However, the parties "neglected to execute a separate contract covering the regulatory obligations for the Vehicles."[86]

---

[81] *Id.*

[82] *Id.* at 2-3.

[83] *Id.* at 6.

[84] *Id.*

[85] FCA Litigation, Cummins' Brief in Support of Its Motion for TRO and Preliminary Injunction (ECF No. 5) at 5-6.

[86] *Id.* at 5.

110.   One of the key startling facts asserted in the pleadings is that FCA knew about the emissions defect for *years* before the recall process began. As Cummins stated, it "discovered that FCA had been receiving an increasing number of warranty claims relating to the SCR and emissions issues in the Vehicles for ***several years prior*** to Cummins discovering the emissions issues in the Vehicles."[87] However, "FCA did not notify Cummins of the SCR warranty claims as they were occurring. Rather, FCA managed and paid for the SCR warranty claims on its own as they occurred."[88] "Due to FCA's delay in informing Cummins, Cummins was unable to earlier investigate the SCR warranty issues and identify potential solutions to the then possible emissions issues."[89]

111.   In response to Cummins' allegations, FCA acknowledged that in "September 2014, FCA US identified an increasing number of warranty claims related to the SCR system installed in the Vehicles. Cummins and FCA US investigated the issue and determined that a defect in the SCR system was causing emissions to exceed the applicable emission standard for [NOx]."[90] Hence, even by

---

[87] FCA Litigation, Cummins' Verified Answer, Affirmative Defenses, Counterclaim and Jury Demand (ECF No. 9) at 13 (emphasis added).

[88] *Id.*

[89] *Id.*

[90] FCA Litigation, FCA's Response in Opposition to Cummins' Motion for TRO and Preliminary Injunction (ECF No. 16) at 3.

FCA's own admission, it knew about the defect years prior to Cummins initiating a voluntary recall; the actual dates when FCA knew about the problem are unknown.

112.   Despite full awareness of the defect, "[t]he FCA employee responsible for sending out the [notification] letters informed Cummins on August 17, 2016, two days after FCA was supposed to have sent out the letters, that FCA was not sending out the letters until FCA and Cummins had worked out the commercial issues—among other things, an agreement in advance about which company would pay for the recall. FCA suddenly used the recall required by the agencies as commercial negotiating leverage."[91] According to a sworn declaration, two days after FCA was supposed to send out the recall letters, a FCA representative told Cummins that he had been ordered by its general counsel not to send out the letters until FCA and Cummins worked out the "commercial issues" between the companies.[92]

113.   According to Cummins, "FCA will not effectuate the recall of its own vehicles unless Cummins agrees that it is 100% responsible for the cost of the recall before it occurs. FCA's position is unprecedented in at least the past 20 years

---

[91] *Id.* at 8.

[92] FCA Litigation, Exhibit 4 to Cummins' Motion for TRO and Preliminary Injunction, Declaration of Richard S. Wagner (ECF No. 5-7) at 5.

of the Cummins-FCA relationship."[93] FCA's participation in the recall was necessary, as "FCA holds the dealer relationships and customer data to identify recipients and send out the necessary notifications. FCA also has the necessary supply chain relationships, parts, service tools, and repair facilities to execute the recall and required repairs."[94]

114.   The environmental impact of the defective trucks on the road was substantial, as Cummins acknowledged. "It is in the public's best interest that Vehicles which are not emissions compliant are appropriately recalled and remedied to avoid future harm to the environment."[95] "The environmental impact of over 135,000 vehicle owners with non-emissions compliant vehicles unable to obtain a repair of those vehicles could be significant."[96] According to the report submitted to the EPA, emissions exceeded the applicable limits by 50%.[97]

115.   Despite this imminent harm, "FCA tried to extort Cummins to accept full responsibility for the recall costs merely because FCA holds the keys to the

---

[93] FCA Litigation, Cummins' Brief in Support of Its Motion for TRO and Preliminary Injunction (ECF No. 5) at 9.

[94] *Id.* at 10.

[95] *Id.* at 23.

[96] *Id.* at 24.

[97] FCA Litigation, Exhibit 2 to FCA's Response in Opposition to Cummins' Motion for TRO and Preliminary Injunction (ECF No. 16-3).

recall."[98] As a result, FCA "disregards the needs of over 135,000 vehicle owners that are subject to the recall. These vehicle owners are currently driving vehicles which may not be emissions compliant because FCA has refused to identify the owners and notify them of the recall of their vehicles."[99]

116.   But Cummins' hands were not clean either with respect to the recall. In describing the impact of the recall to dealers, Cummins falsely represented to dealers that "[t]he impact of the proposed repair of the new replacement catalyst will be negligible related to emissions, fuel economy, driveability, performance, or safety." In its report to the EPA, Cummins represented that the "New SCR" would average 14.4 MPG, compared to 14.6 MPG for the "old SCR."[100] As detailed elsewhere in this complaint, this contention was false, as truck owners experience a substantial drop in their MPG after the SCR system is replaced.

117.   Cummins was also using the recall as commercial leverage. According to FCA, although it was "willing to assist and support the recall, and FCA US is not suggesting that it would prefer that Cummins undertake the recall

---

[98] FCA Litigation, Cummins' Verified Answer, Affirmative Defenses, Counterclaim and Jury Demand (ECF No. 9) at 20.

[99] *Id.* at 22.

[100] FCA Litigation, Exhibit 2 to Cummins' Motion for TRO and Preliminary Injunction, Declaration of Richard S. Wagner (ECF No. 5-5) at Exhibit A (Rich Wagner letter to Annette Hebert).

alone, it remains true that FCA US could provide Cummins with the vehicle customers' names and Cummins could conduct the recall itself."[101]

118.   Ultimately, the district court entered the TRO and a preliminary injunction, and—following an unsuccessful appeal by FCA—the recall notices were issued. The cost issue remains unresolved.

119.   However, there is no reason to believe that the recall has successfully solved the problem that was the subject of the recall (which is only a small part of the Defect alleged herein). Plaintiffs have routinely had difficulty in getting their Vehicles fixed, either because the fix was not successful, the dealerships lacked the parts to fix it, or the Plaintiffs had to wait weeks to get their Vehicles serviced (even as the Vehicles were about to enter limp mode). Plaintiff Forrest Poulson went to a dealership on June 26, 2017, to get the SCR on his Vehicle replaced. A dealership representative told him that the wait for recall service was six weeks. She also said that she "knew a guy" who could take care of the whole problem for $10,000 by removing the SCR system. Plaintiff Poulson, knowing that was illegal, declined.

---

[101] FCA Litigation, FCA's Response in Opposition to Cummins' Motion for TRO and Preliminary Injunction (ECF No. 16) at 18 (citing article related to Cummins' recalls, located at http://www.ccjdigital.com/cummins-recalling-nearly-5500-engines-due-to-faulty-ecm/).

010684-11 967802 V1

### 8. Use of the Mail and Wire Communications

120. Use of the mail and wire communications in furtherance of the fraudulent scheme was a regular practice and reasonably foreseeable to both defendants, including transmittal or receipt of the following items by Cummins via mail or wire communications:[102]

- 2013 – COCs for 2500s and 3500s (certain models)[103] and 3500s (remaining models).[104]

- 2014 – COCs for 2500 and 3500s (certain models)[105] and 3500s (remaining models).[106]

---

[102] The EPA COC process is almost certainly conducted via wire communications pursuant to the Cross-Media Electronic Reporting Rule ("CROMERR"). *See* 40 CFR Part 3. The CROMERR was expressly designed to preclude the need for mailing in EPA applications and other paperwork. Accordingly, the application requirements—and receipt of certifications from the EPA—necessarily involve either mail or electronic communications. *See* Exhibit 36, Cross-Media Electronic Reporting (Oct. 13, 2005), 70 FR 59847 at 59875, available at https://www.gpo.gov/fdsys/pkg/FR-2005-10-13/pdf/05-19601.pdf ("The process of creating, mailing, receiving, entering, verifying, and correcting paper reports consumes both resources and time. This delays the analysis of the data by EPA and authorized programs and its availability to decision makers and the public."); *see also* Exhibit 37, *Certification and Fuel Economy for Light-Duty Passenger Cars and Trucks*, EPA (Dec. 23, 2016), https://www.epa.gov/vehicle-and-engine-certification/certification-and-fuel-economy-light-duty-passenger-cars-and-trucks (describing how to submit EPA certification applications online).

[103] Exhibit 38, EPA COC to Cummins (Nov. 30, 2012), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=29343&flag=1.

[104] Exhibit 39, EPA COC to Cummins (Nov. 28, 2012), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=29344&flag=1.

[105] Exhibit 40, EPA COC to Cummins (July 30, 2013), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=31006&flag=1.

- 2015 – COCs issued for 2500s and 3500s (certain models)[107] and 3500s (remaining models).[108]

- 2016 – COCs issued for 2500s and 3500s (certain models)[109] and 3500s (remaining models).[110]

- 2017 – COCs issued for 2500s and 3500s (certain models)[111] and 3500s (remaining models).[112]

- 2015 – COC Applications for 2500s and 3500s (certain models)[113] and 3500s (remaining models).[114] In addition, the following letters were sent via mailing or wire communications:

  - Letter from Michael Regenfuss (CARB) to Robert Weiss (Cummins) dated June 26, 2014.

  - Letter from Ravinder Singh (Cummins) to Joel Dalton (EPA) dated April 22, 2014.

---

[106] Exhibit 41, EPA COC to Cummins (July 30, 2013), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=31007&flag=1.

[107] Exhibit 42, EPA COC to Cummins (July 7, 2014), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=32761&flag=1; Exhibit 43, Certification Summary Information Report (July 7, 2014), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=33048&flag=1

[108] Exhibit 44, EPA COC to Cummins (July 7, 2014), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=32762&flag=1

[109] Exhibit 45, EPA COC to Cummins (May 15, 2015), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=35026&flag=1.

[110] Exhibit 46, EPA COC to Cummins (May 15, 2015), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=35027&flag=1.

[111] Exhibit 47, EPA COC to Cummins (July 27, 2016), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=37098&flag=1.

[112] Exhibit 48, EPA COC to Cummins (July 27, 2016), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=37099&flag=1.

[113] Exhibit 49, Application for Certification by Cummins (2015 MY), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34320&flag=1.

[114] Exhibit 50, Application for Certification by Cummins (2015 MY), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34321&flag=1.

    o     Letter from Ravinder Singh (Cummins) to Annette Hebert (CARB) dated April 22, 2014.

    o     "Online credit card" payment by Cummins to EPA of $28,528, dated April 21, 2014, for "motor vehicle and engine compliance program fees." Paid through pay.gov.

- 2016 – COC Applications for 2500s and 3500s (certain models):[115] The following letters were sent via mail or electronic communications:

    o     Letter from Bhushan Pawar (Cummins) to Joel Dalton (EPA) dated January 22, 2015.

    o     Letter from Bhushan Pawar (Cummins) to Annette Hebert (CARB) dated January 22, 2015.

    o     Online credit card payment by Cummins to EPA for $26,741, paid via pay.gov, for "motor vehicle and engine compliance program fees," dated January 12, 2015.

- Letters sent as part of 2016 Application for 3500s (remaining models):

    o     Letter from Ravinder Singh (Cummins) to Joel Dalton (EPA) dated November 26, 2014.

    o     Letter from Ravinder Singh to Annette Hebert (CARB) dated November 26, 2015.

    o     Online credit card payment by Cummins to EPA for "motor vehicle and engine compliance program fees," dated April 22, 2014.

- Application for 2017 for 2500s and 3500s (select models):[116]

---

[115] Exhibit 51, Application for Certification by Cummins (2016 MY), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=35672&flag=1.

[116] Exhibit 52, Application for Certification by Cummins (2017 MY), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=38256&flag=1.

    o      Letter from Bhushan Pawar (Cummins) to Annette Hebert (CARB) dated December 7, 2015.

    o      Letter from Bhushan Pawar (Cummins) to Joel Dalton (EPA) dated December 7, 2015.

- Application for 2017 for 3500s (remaining models):[117]

    o      Letter from Bhushan Pawar (EPA) to Annette Hebert (CARB) dated December 7, 2015.

    o      Letter from Bhushan Pawar to Joel Dalton (EPA) dated December 7, 2015.

121. The required use of the mail and electronic communications is well-known to FCA as well—not only as a matter of common sense and the law, but FCA routinely uses mail and electronic communications with the EPA as part of EPA's compliance efforts, including with other vehicles.[118]

**9. Plaintiffs' and Class Members' Economic Damage**

122. As a result of FCA's and Cummins' unfair, deceptive, and/or fraudulent business practices, and their failure to disclose that under normal operating conditions the Vehicles are not "clean" diesels, emit more pollutants than do gasoline-powered vehicles, and emit more pollutants than permitted under

---

[117] Exhibit 53, Application for Certification by Cummins (2017 MY), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=38257&flag=1.

[118] *See, e.g.*, Exhibit 54, Chrysler Group Application for 2012 Dodge Charger (including letters from Chrysler to EPA and CARB, and wire of funds to EPA), available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=25789&flag=1; *see also* Exhibit 55, available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=28266&flag=1 (same for 2013 DART); Exhibit 56, available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=30175&flag=1 (same for 2014 Jeep).

- 75 -

federal and state laws, and their failure to disclose that the Vehicles do not meet and maintain the advertised fuel efficiency, and break down into "limp mode," thereby potentially stranding the truck owners and costing the owners time and expense from missing work, including the use of the Vehicles at work, owners and/or lessees of the Vehicles have suffered losses in money and/or property. Had Plaintiffs and Class members known of the higher emissions at the time they purchased or leased their Vehicles, they would not have purchased or leased those Vehicles, or they would have paid substantially less for the Vehicles than they did. Moreover, when and if FCA or Cummins recalls the Vehicles and degrades the diesel engine performance and fuel efficiency in order to make the Vehicles compliant with EPA standards, Plaintiffs and Class members will be required to spend additional sums on fuel and will not obtain the performance characteristics of their Vehicles when purchased. Moreover, the Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency and increased wear on their engines.

## IV.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Discovery Rule Tolling

123.   Class members had no way of knowing about the Defendants' deception with respect to the comparatively and unlawfully high emissions of the Vehicles. Indeed, as detailed above, FCA and Cummins knew about the Defect

- 76 -

long before—at least two years before—the recall process was initiated (and likely years before that).

124.   Within the time period of any applicable statutes of limitation, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that the Defendants were concealing the conduct complained of herein and misrepresenting the companies' true position with respect to the emission qualities of the Vehicles.

125.   Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that the Defendants did not report information within their knowledge to federal and state authorities, the dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that the Defendants had concealed information about the true emissions of the Vehicles, which was discovered by Plaintiffs only shortly before this action was filed. Nor, in any event, would such an investigation on the part of Plaintiffs and other Class members have disclosed that the Defendants valued profits over truthful marketing and compliance with the law.

126.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Vehicles.

**B.   Fraudulent Concealment Tolling**

127.   All applicable statutes of limitation have also been tolled by the Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

128.   Instead of disclosing their emissions scheme, the fact that the quality and quantity of emissions from the Vehicles were far worse than represented, and their disregard of law, the Defendants falsely represented that the Vehicles had emissions cleaner than their gasoline-powered counterparts, that the Vehicles complied with federal and state emissions standards, that the diesel engines were "clean," and that they were reputable manufacturers whose representations could be trusted.

**C.   Estoppel**

129.   The Defendants were under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of emissions from the Vehicles and of those Vehicles' emissions systems.

130.   The Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the emissions systems, and the emissions, of the Vehicles.

131.   Based on the foregoing, the Defendants are estopped from relying on any statutes of limitations in defense of this action.

- 78 -

## V.    CLASS ALLEGATIONS

132.   Plaintiffs bring this action on behalf of themselves and as a class

action pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of

Civil Procedure, on behalf of the following class and subclasses (collectively, the

"Classes"):

**The Nationwide Class**

All persons or entities in the United States who owned and or leased a
"Vehicle" as of June 30, 2017. Vehicles include, without limitation, the
2013–2017 Dodge Ram 2500 with Cummins diesel (SCR systems, 2WD,
4WD), and the 2013–2017 Dodge Ram 3500 with Cummins Diesel (SCR
systems, 2WD, 4WD).

**The Alabama Subclass**

All persons or entities in the state of Alabama who owned and/or leased a
Vehicle as of June 30, 2017.

**The Florida Subclass**

All persons or entities in the state of Florida who owned and/or leased a
Vehicle as of June 30, 2017.

**The Georgia Subclass**

All persons or entities in the state of Georgia who owned and/or leased a
Vehicle as of June 30, 2017.

**The Michigan Subclass**

All persons or entities in the state of Michigan who owned and/or leased a
Vehicle as of June 30, 2017.

**The Pennsylvania Subclass**

All persons or entities in the state of Pennsylvania who owned and/or leased
a Vehicle as of June 30, 2017.

133.   Excluded from the Class are individuals who have personal injury claims resulting from the high emissions in the Vehicles. Also excluded from the Class are the Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

134.   Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

135.   This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

136.   **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are hundreds of thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs but may be ascertained from the Defendants' books and records. Class members may be notified of the pendency of

this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

137. **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) & (b)(3): This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

a. Whether the Defendants engaged in the conduct alleged herein;

b. Whether the Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Vehicles into the stream of commerce in the United States;

c. Whether the Vehicles emit pollutants at levels that do not make them "clean" diesels and that do not comply with EPA requirements;

d. Whether the Defendants knew about the comparatively and unlawfully high emissions and, if so, how long the Defendants have known;

e. Whether the Defendants designed, manufactured, marketed, and distributed Vehicles with defective or otherwise inadequate emission controls;

  f.  Whether the Defendants' conduct violates consumer protection

    statutes and constitutes breach of contract and fraudulent concealment

    as asserted herein;

  g.  Whether Plaintiffs and the other Class members overpaid for their

    Vehicles; and

  h.  Whether Plaintiffs and the other Class members are entitled to

    damages and other monetary relief and, if so, in what amount.

138. **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the Defendants' wrongful conduct as described above.

139. **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

140. **Declaratory Relief**: Federal Rule of Civil Procedure 23(b)(2): the Defendants have acted or refused to act on grounds generally applicable to

Plaintiffs and the other members of the Classes, thereby making appropriate declaratory relief, with respect to each Class as a whole.

141. **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against the Defendants, so it would be impracticable for the members of the Classes to individually seek redress for the Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

010684-11 967802 V1

### A.   Claims Brought on Behalf of the Nationwide Class

### COUNT I

## VIOLATION OF 18 U.S.C. § 1962(C)–(D):
## THE RACKETEER INFLUENCED AND CORRUPT
## ORGANIZATIONS ACT ("RICO")

142.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

143.   Plaintiffs bring this Count on behalf of the Nationwide Class against FCA US LLC and Cummins Inc. (inclusively, for purpose of this Count, the "RICO Defendants").

144.   At all relevant times, the RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, a "legal or beneficial interest in property."

145.   18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

146.   18 U.S.C. § 1962(d), among other provisions, makes it unlawful for "any person to conspire to violate" the RICO statute. *See* 18 U.S.C. § 1962(d).

147.   By their own admission, the RICO Defendants moved aggressively to capture a large portion of the "clean" diesel truck market. In so doing, and by their

own admission, they created a product that fell far short of the promises the RICO Defendants made about the product. In particular, the RICO Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (the "Emission Fraud Enterprise"), whose purpose was to deceive regulators and the driving public into believing that the Vehicles were complaint with emissions standards, "clean," and "the lowest emitting diesel engine ever produced," so as to increase revenues and minimize losses from the design, manufacture, distribution, and sale of the Vehicles and the defective catalyst devices installed therein. As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendants were able to extract revenues of billions of dollars from Plaintiffs and the Class. As explained in detail below, the RICO Defendants' years-long misconduct violated 18 U.S.C. § 1962(c) & (d).

### 1. The Emission Fraud Enterprise

148. At all relevant times, the RICO Defendants, along with other individuals and entities, including unknown third parties involved in the design, manufacture, testing, and sale of the Vehicles, operated an association-in-fact enterprise engaged in interstate and foreign commerce, which was formed for the purpose of obtaining EPA Certificates of Conformity (COCs), as well as California Air Resources Board (CARB) Executive Orders (EOs), in order to sell the Vehicles

- 85 -

containing the defective emissions systems throughout the United States, and

through which they conducted a pattern of racketeering activity under 18 U.S.C.

§ 1961(4).

149.   Alternatively, each of the RICO Defendants constitutes a single legal

entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the

RICO Defendants conducted their pattern of racketeering activity in the U.S. In

particular, FCA designed, manufactured, and sold the Vehicles, and Cummins

obtained the COCs and the EOs through material misrepresentations and omissions

in order to introduce the Vehicles into the U.S. stream of commerce. Cummins

participated directly and indirectly in the enterprise by developing, supplying, and

promoting the Engine.

150.   At all relevant times, the Emissions Fraud Enterprise: (a) had an

existence separate and distinct from each Defendant; (b) was separate and distinct

from the pattern of racketeering in which the RICO Defendants engaged; and

(c) was an ongoing organization consisting of legal entities, including FCA and

Cummins, and other entities and individuals associated for the common purpose of

designing, manufacturing, distributing, testing, and selling the Vehicles through

fraudulent COCs and EOs, false emissions tests, deceptive and misleading

marketing and materials, and deriving profits and revenues from those activities.

Each member of the Emissions Fraud Enterprise shared in the bounty generated by

the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud consumers and franchise dealers alike nationwide, and sharing the benefit of earning emissions "credits" as described herein.

151.   The Emissions Fraud Enterprise functioned by selling Vehicles and component parts to the consuming public. The RICO Defendants and their co-conspirators, through their illegal Emissions Fraud Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Vehicles.

152.   The Emissions Fraud Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, and sale or lease of the Vehicles throughout the country, and the receipt of monies from the sale of the same.

153.   Within the Emissions Fraud Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Emissions Fraud Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Vehicles to the general public nationwide.

- 87 -

154.   Each participant in the Emissions Fraud Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Emissions Fraud Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

155.   The RICO Defendants participated in the operation and management of the Emissions Fraud Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

156.   As detailed above, each RICO Defendant also relentlessly promoted the Vehicles as clean, powerful, and cost-efficient. The Defendants routinely proclaimed the Vehicles, and the Engine—*even after they knew better*—as the "lowest emitting diesel engine ever produced, "fully compliant with recent federal mandates," using "clean diesel technology *which leads to near zero emissions*." The Vehicles and Engines were sold as "the epitome of reliability," "virtually indestructible in design," offering "outstanding performance" and "superior fuel economy." All of this success is due to the tight collaboration among the RICO

Defendants—what Cummins called the "most formidable partnership in the working world."

157.   The Enterprise functioned by selling Vehicles, with the Engines, to the public. The RICO Defendants engaged in a pattern of racketing activity through their scheme to increase revenue and profits for the RICO Defendants to sell the Vehicles in interstate and foreign commerce, and to increase the emissions credits they earned, thereby allowing them to sell dirty Vehicles as well, all for an additional profit. The enterprise involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, and sale or lease of the Vehicles throughout the country, and the receipt of monies from the sale of the same.

158.   The RICO Defendants worked closely together to further the enterprise, by and among the following manner and means:

> a.   Designing the Vehicles with the Engines; manufacturing, distributing, and selling the Vehicles that emitted greater pollution than permitted under the applicable regulations;

> b.   Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

c.     Introducing the Vehicles into the stream of U.S. commerce without a valid COC and/or EO;

d.     Concealing the unlawfully high emissions from regulators and the public;

e.     Misleading the public about the defects in the Vehicles and the Engine;

f.     Otherwise misrepresenting or concealing the defective nature of the Vehicles from the public and regulators;

g.     Illegally selling and/or distributing the Vehicles;

h.     Designing, testing, and installing the Engine into the Vehicles; and

i.     Collecting revenues and profits from the sale of such products, including the Vehicles and the Engines.

### 2. Mail and Wire Fraud

159. To carry out, and attempt to carry out, the scheme to defraud, the RICO Defendants, each of whom is a person associated in fact with the enterprise, did knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), & 1962(c), and which employed the

- 90 -

use of mail and wire facilities in violation of 18 U.S.C. §§ 1341 (mail fraud) &

1343 (wire fraud).

160. Specifically, the RICO Defendants have committed, conspired to

commit, and/or aided and abetted in the commission of, at least two predicate acts

of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 & 1343), within the

past ten years. The multiple acts of racketeering activity that the RICO Defendants

committed, or aided or abetted in the commission of, were related to each other,

posed a threat of continued racketeering activity, and therefore constitute a "pattern

of racketeering activity." The racketeering activity was made possible by the RICO

Defendants' regular use of the facilities, services, distribution channels, and

employees of the enterprise. The RICO Defendants participated in the scheme to

defraud by using mail, telephone, and the Internet to transmit mailings and wires in

interstate or foreign commerce.

161. In devising and executing the illegal scheme, the RICO Defendants

devised and knowingly carried out a material scheme and/or artifice to defraud

Plaintiffs and the Nationwide Class or to obtain money from Plaintiffs and the

Nationwide Class by means of materially false or fraudulent pretenses,

representations, promises, or omissions of material facts. For the purpose of

executing the illegal scheme, the RICO Defendants committed these racketeering

acts intentionally and knowingly with the specific intent to advance the illegal scheme.

162.   The RICO Defendants' predicate acts of racketeering, 18 U.S.C. § 1961(1), include but are not limited to:

a.   **Mail Fraud**: The RICO Defendants violated 18 U.S.C. § 1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

b.   **Wire Fraud**: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

163.   The RICO Defendants' use of the mails and wires includes, but is not limited to, the transmission, delivery and shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent or received as a result of Defendants' illegal scheme:

- 2013 – COCs for 2500s and 3500s (certain models)[119] and 3500s (remaining models).[120]

---

[119] Exhibit 38.

[120] Exhibit 39.

- 2014 – COCs for 2500 and 3500s (certain models)[121] and 3500s (remaining models).[122]

- 2015 – COCs issued for 2500s and 3500s (certain models)[123] and 3500s (remaining models).[124]

- 2016 – COCs issued for 2500s and 3500s (certain models)[125] and 3500s (remaining models).[126]

- 2017 – COCs issued for 2500s and 3500s (certain models)[127] and 3500s (remaining models).[128]

- 2015 – COC Applications for 2500s and 3500s (certain models)[129] and 3500s (remaining models).[130] In addition, the following letters were sent via mailing or wire communications:

  o Letter from Michael Regenfuss (CARB) to Robert Weiss (Cummins) dated June 26, 2014.

  o Letter from Ravinder Singh (Cummins) to Joel Dalton (EPA) dated April 22, 2014.

  o Letter from Ravinder Singh (Cummins) to Annette Hebert (CARB) dated April 22, 2014.

  o "Online credit card" payment by Cummins to EPA of $28,528, dated April 21, 2014, for "motor vehicle and engine compliance program fees." Paid through pay.gov.

---

[121] Exhibit 40.

[122] Exhibit 41.

[123] Exhibits 42-43.

[124] Exhibit 44.

[125] Exhibit 45.

[126] Exhibit 46.

[127] Exhibit 47.

[128] Exhibit 48.

[129] Exhibit 49.

[130] Exhibit 50.

- 93 -

- Application for 2016 for 2500s and 3500s (certain models):[131] The following letters were sent via mail or electronic communications:

  o Letter from Bhushan Pawar (Cummins) to Joel Dalton (EPA) dated January 22, 2015.

  o Letter from Bhushan Pawar (Cummins) to Annette Hebert (CARB) dated January 22, 2015.

  o Online credit card payment by Cummins to EPA for $26,741, paid via pay.gov, for "motor vehicle and engine compliance program fees," dated January 12, 2015.

- Letters sent as part of 2016 Application for 3500s (remaining models):

  o Lettter from Ravinder Singh (Cummins) to Joel Dalton (EPA) dated November 26, 2014.

  o Letter from Ravinder Singh to Annette Hebert (CARB) dated November 26, 2015.

  o Online credit card payment by Cummins to EPA for "motor vehicle and engine compliance program fees," dated April 22, 2014.

- Application for 2017 for 2500s and 3500s (select models):[132]

  o Letter from Bhushan Pawar (Cummins) to Annette Hebert (CARB) dated December 7, 2015.

  o Letter from Bhushan Pawar (Cummins) to Joel Dalton (EPA) dated December 7, 2015.

- Application for 2017 for 3500s (remaining models):[133]

---

[131] Exhibit 51.
[132] Exhibit 52.
[133] Exhibit 53.

- 94 -

       o     Letter from Bhushan Pawar (EPA) to Annette Hebert (CARB) dated December 7, 2015.

       o     Letter from Bhushan Pawar to Joel Dalton (EPA) dated December 7, 2015.

- False and misleading emissions tests submitted to federal and state authorities.

- Vehicle registrations and plates as a result of the fraudulently obtained EPA COCs and EOs.

- False or misleading communications to the public and to regulators as set forth above.

- Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented, falsely promoted, and concealed the true nature of the Vehicles.

- Documents intended to facilitate the manufacture and sale of the Vehicles, including bills of lading, invoices, shipping records, reports and correspondence.

- Documents to process and receive payment for the Vehicles by unsuspecting Class members, including invoices and receipts.

- Payments to Cummins.

- Deposits of proceeds.

164. The required use of the mail and electronic communications is well-known to FCA, because FCA was intimately familiar with the EPA and CARB compliance process, and it was reasonably foreseeable to FCA that mail and electronic communications would be used.[134]

---

[134] *See* Exhibits 54-56.

165. The RICO Defendants also used the Internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, the RICO Defendants made misrepresentations about the Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics.

166. The RICO Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

167. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Vehicles were "clean" diesel cars.

168. Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate wire facilities are hidden to the Plaintiffs and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of predicate acts of mail and/or wire fraud that occurred.

169.   The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

170.   The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 & 1343 offenses.

171.   To achieve their common goals, the RICO Defendants hid from the general public the unlawfulness and emission dangers of the Vehicles and obfuscated the true nature of the defect even after regulators raised concerns. The RICO Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the discrepancies in emissions testing and the underperformance of the Vehicles.

- 97 -

172.   The RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Vehicles.

173.   Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics—including initiation of a silent recall.

174.   The RICO Defendants knew and intended that government regulators, as well as Plaintiffs and Class members, would rely on the material misrepresent-ations and omissions made by them about the Vehicles. The RICO Defendants knew and intended that consumers would incur costs as a result.

175.   As fully alleged herein, Plaintiffs, along with hundreds of thousands of other consumers, relied upon Defendants' representations and omissions that were made or caused by them. Plaintiffs' reliance is made obvious by the fact that they purchased illegal Vehicles that never should have been introduced into the U.S. stream of commerce and whose worth has now plummeted since the scheme was revealed. In addition, the EPA, CARB, and other regulators relied on the misrepresentations and material omissions made or caused to be made by the

- 98 -

RICO Defendants; otherwise, the Defendants could not have obtained valid COCs and EOs to sell the Vehicles.

176.   As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and Class members based on their misrepresentations and omissions, while providing Vehicles that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

177.   The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the enterprise and in furtherance of their fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with remediating the Vehicles.

178.   By reason of, and as a result of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and Class

members have been injured in their business and/or property in multiple ways,

including but not limited to:

a.      Purchase or lease of an illegal, defective Vehicle;

b.      Overpayment for a Vehicle, in that Plaintiffs and Class members

believed they were paying for a vehicle that met certain emission and fuel

efficiency standards and obtained a vehicle that was anything but;

c.      The value of the Vehicles has diminished, thus reducing their resale

value;

d.      Other out-of-pocket and loss-of-use expenses; and

e.      Payment for alternative transportation.

179.   The RICO Defendants' violations of 18 U.S.C. § 1962(c) & (d) have

directly and proximately caused injuries and damages to Plaintiffs and Class

members, and Plaintiffs and Class members are entitled to bring this action for

three times their actual damages, as well as injunctive/equitable relief, costs, and

reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II

### VIOLATIONS OF 15 U.S.C. § 2301 *ET SEQ.*
### THE MAGNUSON-MOSS WARRANTY ACT

180.   Plaintiffs reallege and incorporate by reference all paragraphs as

though fully set forth herein.

181.   This claim is brought on behalf of the Nationwide Class.

- 100 -

182.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

183.   FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

184.   The Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

185.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

186.   FCA's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

187.   FCA breached these warranties, as described in more detail above. Without limitation, the Vehicles are equipped with a defective Engine that breaks down and releases emissions far in excess of U.S. and California regulations. The Vehicles share a common design defect in that the Engine fails to operate as represented by FCA.

188.   Plaintiffs and the other Class members have had sufficient direct dealings with either FCA or its agents (*e.g.*, dealerships and technical support) to establish privity of contract between FCA on one hand, and Plaintiffs and each of

the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided with the Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

189.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

190.   At the time of sale or lease of each Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

191.   Plaintiffs and the other Class members would suffer economic hardship if they returned their Vehicles but did not receive the return of all payments made by them. Because FCA is refusing to acknowledge any revocation

of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Vehicles by retaining them.

192. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

193. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of the Vehicles, in an amount to be proven at trial.

### B. Claims Brought on Behalf of the Michigan Subclass

### COUNT I

### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (MICH. COMP. LAWS § 445.903 *ET SEQ.*)

194. Plaintiff Jeremy Raymo ("Plaintiff" for purposes of all Michigan Subclass claims) incorporates by reference all paragraphs as though fully set forth herein.

195. This claim is brought on behalf of the Michigan Subclass.

196. Plaintiff and the Michigan Class Members were "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

197. The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct

- 103 -

of trade or commerce," including "(c) Representing that goods or services have . . . characteristics . . . that they do not have"; "(e) Representing that goods or services are of a particular standard … if they are of another"; "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

198.  In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Defendants further willfully failed to disclose and actively concealed that the fuel economy of the Vehicles would drop precipitously following service at the

- 104 -

dealerships, including service that was performed secretly and without Plaintiff's knowledge. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

199.   In purchasing or leasing the Vehicles, Plaintiff and the other Subclass members were deceived by the Defendants' failure to disclose that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop

precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge.

200.   Plaintiff and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiff and Subclass members did not, and could not, unravel Defendants' deception on their own.

201.   The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

202.   The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

203.   The Defendants intentionally and knowingly misrepresented material facts regarding the Vehicles with an intent to mislead Plaintiff and the Subclass.

204.   The Defendants knew or should have known that their conduct violated the Michigan CPA.

205.   The Defendants owed Plaintiff and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.     Possessed exclusive knowledge regarding the defective SCR/emissions system;

b.      Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

c.      Made incomplete representations that they maintained effective SCR/emissions systems, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

206.   The Defendants had a duty to disclose that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

207.   The Defendants' conduct proximately caused injuries to Plaintiff and the other Subclass members.

208.   Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiff and the other Subclass members overpaid for

- 107 -

their Vehicles and did not receive the benefit of their bargain, and their Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

209.   The Defendants' violations present a continuing risk to Plaintiff as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

210.   Plaintiff seeks monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiff and each Michigan Subclass member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911. Plaintiff also seek punitive damages against the Defendants because they carried out despicable conduct with willful and conscious disregard of the rights of others. The Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON MICHIGAN LAW)

211.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

212.   This claim is brought on behalf of the Michigan Subclass.

- 108 -

213.   The Defendants intentionally concealed that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, or the Defendants acted with reckless disregard for the truth and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

214.   The Defendants further affirmatively misrepresented to Plaintiff and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Vehicles they were selling had no significant defects, were clean and low-emission vehicles, complied with EPA regulations, were fuel-efficient, and would perform and operate properly when driven in normal usage.

215.   The Defendants knew these representations were false when made.

216.   The Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer

would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable, and service would lead to a precipitous drop in fuel economy.

217.    The Defendants had a duty to disclose that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

218.    As alleged in this Complaint, at all relevant times, the Defendants have held out the Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising

- 110 -

campaign, that the Vehicles emitted unlawfully high levels of pollutants, including

NOx, as described above, and that the fuel economy of the Vehicles would drop

precipitously following service at the dealerships, including service that was

performed secretly and without Plaintiff's knowledge, and were non-compliant

with EPA emissions requirements, making other disclosures about the emission

system deceptive.

219.   The truth about the defective emissions controls, the non-compliance

with EPA emissions requirements, and the precipitous drop in performance of the

Vehicles was known only to the Defendants; Plaintiff and the Subclass members

did not know of these facts and the Defendants actively concealed these facts from

Plaintiff and Subclass members.

220.   Plaintiff and Subclass members reasonably relied upon the

Defendants' deception. They had no way of knowing that the Defendants'

representations were false and/or misleading. As consumers, the Plaintiff and

Subclass members did not, and could not, unravel the Defendants' deception on

their own. Rather, the Defendants intended to deceive Plaintiff and Subclass

members by concealing the true facts about the Vehicles' emissions and defects.

221.   The Defendants also concealed and suppressed material facts

concerning what is evidently the true culture of the Defendants—a culture

characterized by an emphasis on profits and sales above compliance with federal

and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiff and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Vehicles are doing.

222.   The Defendants' false representations were material to consumers, because they concerned the quality of the Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the Vehicles. As the Defendants well knew, their customers, including Plaintiff and Subclass members, highly valued that the Vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

223.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members. The Defendants also had a duty to disclose because

- 112 -

they made general affirmative representations about the qualities of the Vehicles with respect to emissions, starting with references to them as the lowest-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the Vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the Vehicles at issue. Having volunteered to provide information to Plaintiff and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Vehicles purchased or leased by Plaintiff and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their Vehicles must pass. The Defendants represented to Plaintiff and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

010684-11 967802 V1

224.   The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their Vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiff and Subclass members.

225.   The Defendants still have not made full and adequate disclosures, and they continue to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of the Vehicles.

226.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting Vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

227.   Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they own Vehicles that are

diminished in value as a result of the Defendants' concealment of the true quality and quantity of those Vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' Vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiff and Subclass members who purchased or leased new or certified previously owned Vehicles would have paid less for their Vehicles or would not have purchased or leased them at all.

228.   The value of Plaintiff's and Subclass members' Vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Vehicles, the unlawfully high emissions of the Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiff's and Subclass members' Vehicles and made any reasonable consumer reluctant to purchase any of the Vehicles, let alone pay what otherwise would have been fair market value for the Vehicles.

229.   Accordingly, the Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

230.   The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF CONTRACT
## (BASED ON MICHIGAN LAW)

231.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

232.   Plaintiff brings this Count on behalf of the Michigan Subclass.

233.   The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, caused Plaintiff and the other Subclass members to make their purchases or leases

- 116 -

of their Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Subclass members would not have purchased or leased these Vehicles, would not have purchased or leased these Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Engine and which were not marketed as including such a system. Accordingly, Plaintiff and the other Subclass members overpaid for their Vehicles and did not receive the benefit of their bargain.

234.   Each and every sale or lease of a Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiff and the other Subclass members defective Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Vehicles turns off or is limited during normal driving conditions, and is thus less valuable than vehicles not equipped with the Engine.

235.   As a direct and proximate result of FCA's breach of contract, Plaintiff and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

### C.   Claims Brought on Behalf of the Alabama Subclass

## COUNT I

## VIOLATIONS OF THE ALABAMA DECEPTIVE

- 117 -

## TRADE PRACTICES ACT
## (ALA. CODE § 8-19-1 *ET SEQ.*)

236.   Plaintiff Forrest Poulson ("Plaintiff") incorporates by reference all paragraphs as though fully set forth herein.

237.   Plaintiff brings this Count on behalf of the Alabama Subclass.

238.   Plaintiff and the Subclass members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

239.   Plaintiff, the Subclass members, and the Defendants are "persons" within the meaning of Ala. Code § 8-19-3(5).

240.   The Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

241.   The Defendants were and are engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

242.   The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

- 118 -

243.   Plaintiff intends to assert a claim under the Alabama DTPA. Plaintiff will make a demand in satisfaction of Ala. Code § 8-19-3 and may amend this Complaint to assert claims under the Alabama DTPA once the required 15 days have elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Alabama DTPA.

## COUNT II

## BREACH OF CONTRACT
## (BASED ON ALABAMA LAW)

244.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

245.   Plaintiff brings this Count on behalf of the Alabama Subclass.

246.   The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, caused Plaintiff and the other Subclass members to make their purchases or leases of their Vehicles. Absent those misrepresentations and omissions, Plaintiff and the

- 119 -

other Subclass members would not have purchased or leased these Vehicles, would not have purchased or leased these Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Engine and which were not marketed as including such a system. Accordingly, Plaintiff and the other Subclass members overpaid for their Vehicles and did not receive the benefit of their bargain.

247.   Each and every sale or lease of a Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiff and the other Subclass members defective Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Vehicles turns off or is limited during normal driving conditions, and is thus less valuable than vehicles not equipped with the Engine.

248.   As a direct and proximate result of FCA's breach of contract, Plaintiff and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT III**

**FRAUDULENT CONCEALMENT
(BASED ON ALABAMA LAW)**

249.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

- 120 -

250.   This claim is brought on behalf of the Alabama Subclass.

251.   The Defendants intentionally concealed that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, or the Defendants acted with reckless disregard for the truth and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

252.   The Defendants further affirmatively misrepresented to Plaintiff and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Vehicles they were selling had no significant defects, were clean and low-emission vehicles, complied with EPA regulations, were fuel-efficient, and would perform and operate properly when driven in normal usage.

253.   The Defendants knew these representations were false when made.

254.   The Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than

gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable, and service would lead to a precipitous drop in fuel economy.

255.   The Defendants had a duty to disclose that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

256.   As alleged in this Complaint, at all relevant times, the Defendants have held out the Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a

- 122 -

reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

257.   The truth about the defective emissions controls, the non-compliance with EPA emissions requirements, and the precipitous drop in performance of the Vehicles was known only to the Defendants; Plaintiff and the Subclass members did not know of these facts and the Defendants actively concealed these facts from Plaintiff and Subclass members.

258.   Plaintiff and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiff and Subclass members by concealing the true facts about the Vehicles' emissions and defects.

259.   The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture

characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiff and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Vehicles are doing.

260.   The Defendants' false representations were material to consumers, because they concerned the quality of the Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the Vehicles. As the Defendants well knew, their customers, including Plaintiff and Subclass members, highly valued that the Vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

261.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by

- 124 -

Plaintiff or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the Vehicles with respect to emissions, starting with references to them as the lowest-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the Vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the Vehicles at issue. Having volunteered to provide information to Plaintiff and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Vehicles purchased or leased by Plaintiff and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their Vehicles must pass. The Defendants represented to Plaintiff and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

010684-11 967802 V1

262.   The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their Vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiff and Subclass members.

263.   The Defendants still have not made full and adequate disclosures, and they continue to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of the Vehicles.

264.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting Vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

265.   Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they own Vehicles that are

- 126 -

diminished in value as a result of the Defendants' concealment of the true quality and quantity of those Vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' Vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiff and Subclass members who purchased or leased new or certified previously owned Vehicles would have paid less for their Vehicles or would not have purchased or leased them at all.

266.   The value of Plaintiff's and Subclass members' Vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Vehicles, the unlawfully high emissions of the Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiff's and Subclass members' Vehicles and made any reasonable consumer reluctant to purchase any of the Vehicles, let alone pay what otherwise would have been fair market value for the Vehicles.

267.   Accordingly, the Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

268. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**D. Claims Brought on Behalf of the Florida Subclass**

## COUNT I

## VIOLATIONS OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
## (FLA. STAT. § 501.201 *ET SEQ.*)

269. Plaintiffs Brendon Goldstein and Manuel Pena incorporate by reference all preceding allegations as though fully set forth herein.

270. Plaintiffs bring this Count on behalf of the Florida Subclass.

271. Plaintiffs and the Subclass are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("Florida UDTPA"), Fla. Stat. § 501.203(7).

272. Defendants engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

273. Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive

- 128 -

acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

Defendants participated in unfair and deceptive trade practices that violated the

Florida UDTPA as described herein. In the course of the Defendants' business,

they willfully failed to disclose and actively concealed that the SCR system in the

Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-

powered vehicles, that the Vehicles emit far more pollution than a reasonable

consumer would expect in light of the Defendants' advertising campaign, and that

the Vehicles emitted unlawfully high levels of pollutants, including NOx, as

described above. Defendants further willfully failed to disclose and actively

concealed that the fuel economy of the Vehicles would drop precipitously

following service at the dealerships, including service that was performed secretly

and without Plaintiffs' knowledge. Accordingly, the Defendants engaged in unfair

methods of competition, unconscionable acts or practices, and unfair or deceptive

acts or practices, including representing that Vehicles have characteristics, uses,

benefits, and qualities which they do not have; representing that Vehicles are of a

particular standard and quality when they are not; failing to reveal a material fact,

the omission of which tends to mislead or deceive the consumer, and which fact

could not reasonably be known by the consumer; making a representation of fact or

statement of fact material to the transaction such that a person reasonably believes

the represented or suggested state of affairs to be other than it actually is; and

- 129 -

failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

274.   In purchasing or leasing the Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiffs' knowledge.

275.   Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel Defendants' deception on their own.

276.   The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

277.   The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

278.   The Defendants intentionally and knowingly misrepresented material facts regarding the Vehicles with an intent to mislead Plaintiffs and the Subclass.

279.   The Defendants knew or should have known that their conduct violated the Florida UDTPA.

280.   The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.      Possessed exclusive knowledge regarding the defective SCR/emissions system;

b.      Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.      Made incomplete representations that they maintained effective SCR/emissions systems, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

281.   The Defendants had a duty to disclose that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described

above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiffs' knowledge, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

282.   The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

283.   Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Vehicles and did not receive the benefit of their bargain, and their Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

284.   The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

285.   Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

## COUNT II

## BREACH OF CONTRACT
## (BASED ON FLORIDA LAW)

286.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

287.   Plaintiffs bring this Count on behalf of the Florida Subclass members.

288.   The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiffs' knowledge, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Vehicles, would not have purchased or leased these Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Engine and which were not marketed as including such a system.

Accordingly, Plaintiffs and the other Subclass members overpaid for their Vehicles and did not receive the benefit of their bargain.

289.   Each and every sale or lease of a Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Vehicles turns off or is limited during normal driving conditions, and is thus less valuable than vehicles not equipped with the Engine.

290.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

### FRAUDULENT CONCEALMENT
### (BASED ON FLORIDA LAW)

291.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

292.   Plaintiffs bring this Count on behalf of the Florida Subclass.

293.   The Defendants intentionally concealed that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable

- 134 -

consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiffs' knowledge, or the Defendants acted with reckless disregard for the truth and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

294.   The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Vehicles they were selling had no significant defects, were clean and low-emission vehicles, complied with EPA regulations, were fuel-efficient, and would perform and operate properly when driven in normal usage.

295.   The Defendants knew these representations were false when made.

296.   The Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable, and service would lead to a precipitous drop in fuel economy.

297. The Defendants had a duty to disclose that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiffs' knowledge, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

298. As alleged in this Complaint, at all relevant times, the Defendants have held out the Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was

- 136 -

performed secretly and without Plaintiffs' knowledge, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

299.   The truth about the defective emissions controls, the non-compliance with EPA emissions requirements, and the precipitous drop in performance of the Vehicles was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

300.   Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Vehicle emissions and defects.

301.   The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations.

- 137 -

Consumers buy diesel cars from the Defendants because they feel they are clean

diesel cars. They do not want to be spewing noxious gases into the environment.

And yet, that is precisely what the Vehicles are doing.

302.   The Defendants' false representations were material to consumers,

because they concerned the quality of the Vehicles, because they concerned

compliance with applicable federal and state law and regulations regarding clean

air and emissions, and also because the representations played a significant role in

the value of the Vehicles. As the Defendants well knew, their customers, including

Plaintiffs and Subclass members, highly valued that the Vehicles they were

purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions,

and they paid accordingly.

303.   The Defendants had a duty to disclose the emissions defect, defective

design of emissions controls, and violations with respect to the Vehicles because

details of the true facts were known and/or accessible only to the Defendants,

because the Defendants had exclusive knowledge as to such facts, and because the

Defendants knew these facts were not known to or reasonably discoverable by

Plaintiffs or Subclass members. The Defendants also had a duty to disclose

because they made general affirmative representations about the qualities of the

Vehicles with respect to emissions, starting with references to them as the lowest-

emissions diesel cars and as compliant with all laws in each country, which were

- 138 -

misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the Vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the Vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their Vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

304. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their Vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which

010684-11 967802 V1

perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

305.   The Defendants still have not made full and adequate disclosures and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Vehicles.

306.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting Vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

307.   Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own Vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those Vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' Vehicles, and the serious

- 140 -

issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned Vehicles would have paid less for their Vehicles or would not have purchased or leased them at all.

308.   The value of Plaintiffs' and Subclass members' Vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Vehicles, the unlawfully high emissions of the Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' Vehicles and made any reasonable consumer reluctant to purchase any of the Vehicles, let alone pay what otherwise would have been fair market value for the Vehicles.

309.   Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

310.   The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an

assessment of punitive damages in an amount sufficient to deter such conduct in

the future, which amount is to be determined according to proof.

**E.   Claims Brought on Behalf of the Georgia Subclass**

**COUNT I**

**VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
(GA. CODE ANN. § 10-1-390 *ET SEQ.*)**

311.   Plaintiff Forrest Poulson incorporates by reference all preceding

allegations as though fully set forth herein.

312.   This claim is made on behalf of the Georgia Subclass.

313.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares

"[u]nfair or deceptive acts or practices in the conduct of consumer transactions and

consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann.

§ 10-1-393(a), including, but not limited to, "representing that goods or services

have sponsorship, approval, characteristics, ingredients, uses, benefits, or

quantities that they do not have," "[r]epresenting that goods or services are of a

particular standard, quality, or grade . . . if they are of another," and "[a]dvertising

goods or services with intent not to sell them as advertised." Ga. Code. Ann. § 10-

1-393(b). Plaintiff will make a demand in satisfaction of Ga. Code. Ann. § 10-1-

399(b), and may amend this Complaint to assert claims under the Georgia FBPA

once the required notice period has elapsed. This paragraph is included for

- 142 -

purposes of notice only and is not intended to actually assert a claim under the Georgia FBPA.

## COUNT II

### BREACH OF CONTRACT
### (BASED ON GEORGIA LAW)

314.  Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

315.  This claim is brought on behalf of the Georgia Subclass.

316.  The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, caused Plaintiff and the other Subclass members to make their purchases or leases of their Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Subclass members would not have purchased or leased these Vehicles, would not have purchased or leased these Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain

- 143 -

the defective Engine and which were not marketed as including such a system. Accordingly, Plaintiff and the other Subclass members overpaid for their Vehicles and did not receive the benefit of their bargain.

317.   Each and every sale or lease of a Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiff and the other Subclass members defective Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Vehicles turns off or is limited during normal driving conditions, and is thus less valuable than vehicles not equipped with the Engine.

318.   As a direct and proximate result of FCA's breach of contract, Plaintiff and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
### (BASED ON GEORGIA LAW)

319.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

320.   This claim is brought on behalf of the Georgia Subclass.

321.   The Defendants intentionally concealed that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-

powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, or the Defendants acted with reckless disregard for the truth and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

322. The Defendants further affirmatively misrepresented to Plaintiff and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Vehicles they were selling had no significant defects, were clean and low-emission vehicles, complied with EPA regulations, were fuel-efficient, and would perform and operate properly when driven in normal usage.

323. The Defendants knew these representations were false when made.

324. The Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-

compliant, and unreliable, and service would lead to a precipitous drop in fuel economy.

325.   The Defendants had a duty to disclose that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

326.   As alleged in this Complaint, at all relevant times, the Defendants have held out the Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including

- 146 -

NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

327.    The truth about the defective emissions controls, the non-compliance with EPA emissions requirements, and the precipitous drop in performance of the Vehicles was known only to the Defendants; Plaintiff and the Subclass members did not know of these facts and the Defendants actively concealed these facts from Plaintiff and Subclass members.

328.    Plaintiff and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiff and Subclass members by concealing the true facts about the Vehicles' emissions and defects.

329.    The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the

public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiff and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Vehicles are doing.

330.   The Defendants' false representations were material to consumers, because they concerned the quality of the Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the Vehicles. As the Defendants well knew, their customers, including Plaintiff and Subclass members, highly valued that the Vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

331.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the Vehicles

- 148 -

with respect to emissions, starting with references to them as the lowest-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the Vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the Vehicles at issue. Having volunteered to provide information to Plaintiff and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Vehicles purchased or leased by Plaintiff and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their Vehicles must pass. The Defendants represented to Plaintiff and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

332.   The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the

- 149 -

perception that their Vehicles were not clean diesel vehicles and did not or could

not comply with federal and state laws governing clean air and emissions, which

perception would hurt the brand's image and cost the Defendants money, and they

did so at the expense of Plaintiff and Subclass members.

333.   The Defendants still have not made full and adequate disclosures, and

they continue to defraud Plaintiff and Subclass members by concealing material

information regarding the emissions qualities of the Vehicles.

334.   Plaintiff and Subclass members were unaware of the omitted material

facts referenced herein, and they would not have acted as they did if they had

known of the concealed and/or suppressed facts, in that they would not have

purchased purportedly reduced-emissions diesel cars manufactured by the

Defendants, and/or would not have continued to drive their heavily polluting

Vehicles, or would have taken other affirmative steps in light of the information

concealed from them. Plaintiff's and Subclass members' actions were justified.

The Defendants were in exclusive control of the material facts, and such facts were

not generally known to the public, Plaintiff, or Subclass members.

335.   Because of the concealment and/or suppression of the facts, Plaintiff

and Subclass members have sustained damage because they own Vehicles that are

diminished in value as a result of the Defendants' concealment of the true quality

and quantity of those Vehicles' emissions and the Defendants' failure to timely

disclose the defect or defective design of the diesel engine system, the actual

emissions qualities and quantities of the Defendants' Vehicles, and the serious

issues engendered by the Defendants' corporate policies. Had Plaintiff and

Subclass members been aware of the true emissions facts with regard to the

Vehicles, and the Defendants' disregard for the truth and compliance with

applicable federal and state law and regulations, Plaintiff and Subclass members

who purchased or leased new or certified previously owned Vehicles would have

paid less for their Vehicles or would not have purchased or leased them at all.

336.   The value of Plaintiff's and Subclass members' Vehicles has

diminished as a result of the Defendants' fraudulent concealment of the defective

emissions controls of the Vehicles, the unlawfully high emissions of the Vehicles,

and the non-compliance with EPA emissions requirements, all of which has greatly

tarnished the Defendants' brand name attached to Plaintiff's and Subclass

members' Vehicles and made any reasonable consumer reluctant to purchase any

of the Vehicles, let alone pay what otherwise would have been fair market value

for the Vehicles.

337.   Accordingly, the Defendants are liable to Plaintiff and Subclass

members for damages in an amount to be proven at trial.

338.   The Defendants' acts were done wantonly, maliciously, oppressively,

deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and

Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**F.   Claims Brought on Behalf of the Pennsylvania Subclass**

## COUNT I

## BREACH OF CONTRACT
## (BASED ON PENNSYLVANIA LAW)

339.   Plaintiff Gary Gaster incorporates by reference all preceding allegations as though fully set forth herein.

340.   Plaintiff brings this Count on behalf of the Pennsylvania Subclass.

341.   The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, caused Plaintiff and the other Subclass members to make their purchases or leases of their Vehicles. Absent those misrepresentations and omissions, Plaintiff and the

- 152 -

other Subclass members would not have purchased or leased these Vehicles, would not have purchased or leased these Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Engine and which were not marketed as including such a system. Accordingly, Plaintiff and the other Subclass members overpaid for their Vehicles and did not receive the benefit of their bargain.

342. Each and every sale or lease of a Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiff and the other Subclass members defective Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Vehicles turns off or is limited during normal driving conditions, and is thus less valuable than vehicles not equipped with the Engine.

343. As a direct and proximate result of FCA's breach of contract, Plaintiff and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT II**

**FRAUDULENT CONCEALMENT
(BASED ON PENNSYLVANIA LAW)**

344. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

- 153 -

345.    This claim is brought on behalf of the Pennsylvania Subclass.

346.    The Defendants intentionally concealed that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, or the Defendants acted with reckless disregard for the truth and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

347.    The Defendants further affirmatively misrepresented to Plaintiff and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Vehicles they were selling had no significant defects, were clean and low-emission vehicles, complied with EPA regulations, were fuel-efficient, and would perform and operate properly when driven in normal usage.

348.    The Defendants knew these representations were false when made.

349.    The Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than

gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable, and service would lead to a precipitous drop in fuel economy.

350.   The Defendants had a duty to disclose that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

351.   As alleged in this Complaint, at all relevant times, the Defendants have held out the Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the SCR system in the Vehicles is defective, that the Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Vehicles emit far more pollution than a

- 155 -

reasonable consumer would expect in light of the Defendants' advertising campaign, that the Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, and that the fuel economy of the Vehicles would drop precipitously following service at the dealerships, including service that was performed secretly and without Plaintiff's knowledge, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

352.   The truth about the defective emissions controls, the non-compliance with EPA emissions requirements, and the precipitous drop in performance of the Vehicles was known only to the Defendants; Plaintiff and the Subclass members did not know of these facts and the Defendants actively concealed these facts from Plaintiff and Subclass members.

353.   Plaintiff and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiff and Subclass members by concealing the true facts about the Vehicles' emissions and defects.

354.   The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture

- 156 -

characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiff and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Vehicles are doing.

355.   The Defendants' false representations were material to consumers, because they concerned the quality of the Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the Vehicles. As the Defendants well knew, their customers, including Plaintiff and Subclass members, highly valued that the Vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

356.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by

Plaintiff or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the Vehicles with respect to emissions, starting with references to them as the lowest-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the Vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the Vehicles at issue. Having volunteered to provide information to Plaintiff and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Vehicles purchased or leased by Plaintiff and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their Vehicles must pass. The Defendants represented to Plaintiff and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

- 158 -

357.   The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their Vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiff and Subclass members.

358.   The Defendants still have not made full and adequate disclosures, and they continue to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of the Vehicles.

359.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting Vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

360.   Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they own Vehicles that are

diminished in value as a result of the Defendants' concealment of the true quality and quantity of those Vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' Vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiff and Subclass members who purchased or leased new or certified previously owned Vehicles would have paid less for their Vehicles or would not have purchased or leased them at all.

361.   The value of Plaintiff's and Subclass members' Vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Vehicles, the unlawfully high emissions of the Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiff's and Subclass members' Vehicles and made any reasonable consumer reluctant to purchase any of the Vehicles, let alone pay what otherwise would have been fair market value for the Vehicles.

362.   Accordingly, the Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

363.   The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## VI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Subclasses, respectfully request that the Court enter judgment in their favor and against the Defendants, as follows:

A.    Certification of the proposed Nationwide Class and State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.    Restitution, including at the election of Class members, recovery of the purchase price of their Vehicles, or the overpayment or diminution in value of their Vehicles;

C.    Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial, except that monetary relief under certain consumer protection statutes, as stated above, shall be limited prior to completion of the applicable notice requirements;

D.     An order requiring the Defendants to pay both pre- and post-judgment interest on any amounts awarded;

E.     An award of costs and attorneys' fees; and

F.     Such other or further relief as may be appropriate.

## VII.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.


Dated: July 3, 2017                    Respectfully submitted,

                                       By: */s/ Steve W. Berman*
                                       Steve W. Berman
                                       Jerrod C. Patterson
                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                       1918 Eighth Avenue, Suite 3300
                                       Seattle, WA 98101
                                       Telephone: (206) 623-7292
                                       Facsimile: (206) 623-0594
                                       Email: steve@hbsslaw.com
                                       Email: jerrodp@hbsslaw.com

                                       E. Powell Miller (P39487)
                                       Sharon S. Almonrode (P33938)
                                       THE MILLER LAW FIRM PC
                                       950 W. University Dr., Ste. 300
                                       Rochester, MI 48307
                                       Telephone: (248) 841-2200
                                       Facsimile: (248) 652-2852
                                       Email: epm@millerlawpc.com
                                       Email: ssa@millerlawpc.com

                                       Christopher A. Seeger
                                       SEEGER WEISS LLP
                                       77 Water Street
                                       New York, NY 10005
                                       Telephone: (212) 584-0700
                                       Facsimile: (212) 584-0799
                                       Email: cseeger@seegerweiss.com

James E. Cecchi
CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: JCecchi@carellabyrne.com

Eric J. Artrip
MASTANDO & ARTRIP
301 Washington St., Suite 302
Huntsville, Alabama 35801
Telephone: (256) 532-2222
Facsimile: (256) 513-7489

*Attorneys for Plaintiffs and the
Proposed Class*